## CHICAGO, M. & ST. P. RY. CO. v. CLARKSON.

(Circuit Court of Appeals, Eighth Circuit. July 19, 1906.)

### No. 2,351.

1. RAILROADS—PEDESTRIANS—DEATH AT CROSSING—NEGLIGENCE.

Where, at the time plaintiff's intestate attempted to cross defendant's railroad track by crossing in front of a flat car being pushed over a crossing in front of an engine, the night was so dark that deceased could not see the flat car, and the switchman if he had stationed himself at the forward end of the car would not have seen deceased, the switchman's failure to station himself with his lantern at the end of the car instead of near the middle thereof, did not establish negligence on defendant's part in failing to have a man with a lighted lantern "upon the forward end of the car."

2. SAME—PRESENCE OF FLAGMAN.

Where intestate, a railroad engineer who was killed at a crossing, had knowledge that switching was habitually conducted over the crossing at about the time of the accident and was going on at the time and that no flagman was kept at that place, defendant was not guilty of negligence in failing to have a flagman at the crossing to warn pedestrians that the train was approaching.

3. SAME—CARE REQUIRED—KNOWLEDGE OF DANGER.

Where intestate, a railroad man of long e-perience and observation, had habitually passed the crossing where he was killed, and was familiar with defendant's habit in switching cars over the crossing, and at the time of the accident the headlight of the engine could have been distinctly seen for some distance if intestate had looked therefor, he was legally charged with having seen the same.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, § 1026.]

4. EVIDENCE—ADMISSIONS—RES GESTÆ—EFFECT.

Statements by intestate immediately after he was run over by defendant's train, that it was his own fault, that he saw the switch engine and thought he would have time to get over in front of it, but that he did not see the flat car that struck him, were competent against his administrator, in an action against the railroad company for his death, and it was error to charge that the jury should give but little heed to such admissions, and that plaintiff was in no event to be bound thereby.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§ 372–376.]

5. RAILROADS—NEGLIGENCE—EVIDENCE.

In an action for the death of plaintiff's intestate at a crossing, evidence of defendant's negligence *held* insufficient to sustain a verdict for plaintiff.

In Error to the Circuit Court of the United States for the Northern District of Iowa.

This is an action by the legal representative of James F. Clarkson to recover damages for his accidental death alleged to have been caused by the negligence of the plaintiff in error (hereinafter for convenience designated as the defendant). The accident occurred at a street crossing in the city of Cedar Rapids, Iowa, on the evening of October 24, 1902. The plaintiff below recovered judgment in the sum of $2,000.

As the decision of the case turns upon a correct understanding of the evidence, it is necessary to give a summary of the essential facts. The deceased was a man 63 years old, in possession of all his faculties and power of locomotion. For fifteen years he had been a railroad engineer on the Chicago, Rock Island & Pacific Railway; and had worked in its shops at Cedar Rapids for five or six years just preceding the accident; said shops were near to the switching tracks in question. Daily he passed over the place where he met his fate, and was familiar with the situation and the custom and methods of the defendant railroad company in conducting its business at the place of the accident, which occurred at the intersection of the railroad tracks and Fifth street. At this point were eight railroad tracks used by the defendant for switching purposes, and was near to the western limits of the switch yard. Fifth street terminated just north of this crossing in the adjoining block, where there were some warehouses. While in a sense this was a public street crossing, there is little ground for reasonable controversy that it was a publicly recognized fact that this crossing was practically given up to the use of the railroad company. Vehicles rarely used it, and then for the purpose of hauling goods from the freight house, which customarily was reached by other avenues of access. There were no sidewalks at this crossing; but in the center of the street were laid planks about 16 feet long. Pedestrians who used this crossing were principally employés of the railroad companies in going to and fro in the day time to the shops to the north.

The evidence shows that the switching of cars over this crossing was conducted at all times; that at the time of the accident, between 6 and 7 o'clock p. m., it was customary for the switch engine of the defendant to be engaged in moving cars—box and flat—about the yards and over said crossing. At about 6 p. m. of the day in question the yardmaster sent the switching crew

with the engine to the water tank, some 600 feet to the east, over said cross-
ing, to return to the west end of the track No. 2 to get two flat cars—one on
the west and the other on the east side of the crossing. The evidence on be-
half of the plaintiff below was substantially as follows: In an application
made for continuance, sworn to by one of plaintiff's attorneys, it was stated
what the absent witness, McGinn, would testify if present. To avoid the
granting of a continuance counsel for the defendant admitted that if the wit-
ness were present he would testify as stated in the affidavit. This statement
was that McGinn was one of the two switchmen working with said switch
engine at the time of the accident; that he made the coupling between the
engine and the flat car which passed over Clarkson just before the accident;
that he did not see the deceased, and got off the car as soon as he heard the
noise, within a few seconds or a minute or so after the injury, and helped
to pick Clarkson up; that as he did so Clarkson said in his presence and hear-
ing that he saw the headlight of the engine, but did not see the flat car, and
thought he had time to get across. The following was contained in his state-
ment, which was admitted in evidence over the defendant's objection: "The
proper place for me at the time that the car was put in motion and moved
towards and over Fifth street was at the front end of the car which hit
Clarkson, with my lantern lighted." He said it was after sunset, and dark
at the time of the accident. It is noticeable that in this affidavit care is taken
not to state the position occupied by McGinn when thus on the car with his
lantern.

The plaintiff below then introduced Jerry Funda as a witness, age 26 years,
a switchman in the employ of the Chicago, Rock Island & Pacific Railway
Company, who, at the time of the accident was in the employ of the defendant,
and belonged to the switching crew of the engine in question. After going
down to the water tank the engine returned without any cars attached. As the
engine went west over Fifth street he dropped off at the crossing and tried to
open the knuckle on the flat car which stood on track No. 2—the track in
question—15 or 20 feet west of the crossing. He went to the west end of the
car. He had a lighted lantern with him as it was then after dark. The
knuckle on that car would not open. It was a flat car, with no sides or ends,
and a level floor. The floor would come below his shoulders—he was five feet
six inches high. When he found he could not open the knuckle, he went down
the track to the east two car lengths where the other flat car stood, and opened
the knuckle on the west end thereof. When he started to go east to open the
knuckle the engine was just coming in on that track, but had not yet reached
the car standing west of the street. He heard the engine bump against the car
and couple on, when he was closer to the second car than to the one to which
the engine coupled. He opened the knuckle, and at that time the engine and
car were coming towards him. The length of the car was 34 to 36 feet. He
did not see or hear anything of Clarkson, and did not see anybody around
the crossing until after the accident. McGinn was on top of the car. The
night was dark and he could tell where McGinn was by his lantern, and the
light was shining on him from the headlight of the engine, which was heading
towards him. His judgment was that McGinn was about the center of the
car; he walked to the head end of it, by which time the head end of the car
must have been over the crossing. When the engine came up to the car
McGinn was on the footboard of the engine. When he first noticed him
he was standing in the center of the car, about the middle, with his
lantern, and the car was about the middle of the crossing, moving. He
saw him walk on towards the east end of the car. Up to that time he
had not heard any outcry or anything wrong. The engineer said he had
run over somebody, and McGinn jumped off the car and they walked
up there. The engine was then about over the crossing; that is, clearing
the planks. Clarkson was found under the tender east of the planks of
the crossing between 15 and 25 feet. His body was lying between the rails.
After they got him from under the tender Clarkson said: "Boys, it is all
my fault. I have been railroading for a good many years. I saw that
headlight, but I did not see the car. I thought I had time to get across,
but I got caught before I got over. I did not notice the first car." The

witness testified· that the headlight was shining brightly at the time; that when he heard the engine couple onto the flat car and looked back he could see the east end of the flat car ahead of the engine, and he could see the reflection of the light down on the east end of the car. He further testified that when the engine was working at this crossing he would couple the cars at the head end; that cars being switched would always be ahead ·of the engine at that end of the yards; that the work was being done in the usual manner that evening.

On cross-examination he testified that in walking across the street and going 65 or 70 feet from the crossing to the east car he had a lighted lantern in his hand. He had no difficulty in seeing the flat car McGinn was on. He could see it plainly. In his judgment the headlight would strike about the center of the car. He looked around when he heard the ·engine couple to the flat car. He testified that a man in that line of business would notice that sound a good many car lengths away. He heard the bell ringing at the time and it continued to ring; that there was no other engine or car moving on any other track at that place. He saw McGinn give the engineer the signal to come ahead when he saw him on the car moving the lantern up and down. He further testified that when he looked back at the car he was right in front of the headlight, and, notwithstanding that fact, he could see the floor of the flat car and McGinn on top of it, and could see the lantern in his hand.

James E. Gallagher, a machinist working for the Chicago, Rock Island & Pacific Railway Company, testified that he was about 200 feet away at the time of the injury; he did not see Clarkson or any one else going towards the crossing; he was not paying any attention to the engine. The first that he heard was some one exclaim "Oh, my!" He looked towards the crossing, and the engine was then about on the plank part of the crossing; that the engine was stopped just east of the crossing. Clarkson lay between 15 and 30 feet east of the plank crossing when they took him from under the engine. On cross-examination, he testified that he remembered seeing the engine moving, pushing the flat car ahead of it; that he was some distance from it; that it was light enough for him to see the flat car by the light of the switch engine, which shone down upon the flat car. When he heard the outcry he looked and saw the switch engine and the flat car, the flat car was past the crossing; that he must have seen the flat car from the side as he could not see it ahead of the engine. It was dark, but he could see it was a flat car.

William J. Monroe, a roundhouse foreman for the Rock Island Company, testified that at the time of the accident he was coming from work, up Fifth street, and heard an unusual noise, and came up to the crossing and saw the men standing around something and discovered that it was Clarkson; that when he noticed there was something wrong he was 100 to 200 feet away; he was not there when Clarkson was taken out; when he got there Clarkson was partly unconscious, but revived later; that he recognized him and said: "I saw the switch engine coming to the crossing and thought I would have time to get over in front of it, but I did not see the flat car, and it struck me"—that he saw the headlight on the engine and thought he had time to get across ahead of it. He testified that most of the people using that crossing were railroad employés, who were in the habit of crossing there morning, noon, and night. He also testified that the switching at that end of the yards was mostly done by the engine pushing in or backing out with the cars ahead of the engine; that Clarkson was in the habit of crossing there four times a day; that Clarkson was a special storekeeper and tool caretaker in the roundhouse.

The wife of the deceased testified that her husband lived until the 26th day of October; that in going to and from the place where he worked he would cross the place in question every morning, noon, and night.

This was practically all the evidence on the part of the plaintiff except as to the earning capacity and age of the deceased.

On behalf of the defendant, George B. Tuthill, the night yardmaster, who directed the crew to take the switch engine down to the water tank as here-

tofore stated, testified that the crew went on duty at 6 o'clock that evening. When they came back from the tank he saw the engine about 150 feet from it; that was about 6:10 or 6:15 p. m., when he directed the crew to go ahead and get the said two cars. There were no other cars there or anything to obstruct the view of Fifth street within the line of the tracks; that there was nothing to obstruct the view of a man coming from the north going south after he passed the transfer track, as to anything that might be upon the main line or any of the tracks. He saw the flat car on track No. 2 east of the Fifth street crossing when he was walking towards the office, and looked over to the one on the west side of the crossing and saw them make the coupling to the flat car. He saw Funda drop off on the Fifth street crossing, and McGinn stayed on the engine to throw the switch, and when he threw it he stepped on the forward footboard of the engine; and when the coupling was made he stepped right up on the flat car and let the brake off and turned around and signaled the engineer to come ahead. McGinn was near the center of the car when he gave the signal and walked toward the head end. The east end of the car was about 20 feet from the plank of the crossing when the coupling was made, and the car was standing still. The engineer did not start the engine until McGinn signaled with the lantern, at which time he was in the center of the car walking toward the front end; that the car and the engine began moving as soon as the signal was given. The car was the standard flat car, the floors of which are between four feet and four feet four inches from the ties. That he had made experiments to see how much of the flat car would be in the rays of the headlight when the car was coupled onto the front of the engine; that when the engine and the car were 47 inches apart the rays struck the ground eight feet ahead of the coupler; that he could see cars on No. 1 track east of the crossing 150 to 165 feet. He testified that when he heard of the accident he hastened to the scene and the first thing that Clarkson said was: "Don't hurt me any more boys, don't hurt me any more;" when they straightened him around and moved the engine off of him he said: "I do not know what I was thinking of. I saw your headlight and heard your bell, but I tried to get across ahead." That Monroe came up afterwards. He further testified that the engine would always have cars ahead of it in switching at that end of the yards, as they seldom made flying switches. On cross-examination he stated that there was a lighted lantern in the hand of McGinn who was on the car; that the car had only 15 or 20 feet to go to reach the planking after the engine touched it.

This witness on cross-examination was compelled by the court, over the objection of the defendant, to answer the question if it was not the duty of McGinn to be on the east end of the car with his lantern. The witness answered that in case of a box car the switchman could hang onto a ladder on the front end; in case of a flat car it is not safe for a man to stand on the extreme front end; he is supposed to stand on the car where he can holler at or whistle or see anybody that might be in front of the car; that they did not require a man to place himself in danger. The further question was asked by counsel for plaintiff, over the objection of defendant's counsel, as follows: "Q. Where you are shoving a flat car or intending to shove a flat car across a public street in a city at night, should there be a man on or near the front end of that car before it passes over the street with a lighted lantern?" The witness answered: "A. There is supposed to be a man on the car with a lighted lantern in his hand." He further testified that the headlight on the engine had been cleaned that day and shone brightly; the reflector caused it to throw out a funnel shaped stream of light ahead. With a flat car coupled to the head of the engine a small portion of the car would not be under the rays of the headlight. A great majority of it would be in the light, and the light would extend ahead of the engine 400 or 500 feet. He further testified that a man on top of the car being pushed over the crossing would ordinarily stand in the center of the car; and that if he stood near the front he would be in danger of being jerked off the car in case of a violent signal to stop or slack; that when he last saw McGinn before the accident he was standing about the proper and usual place for a man to stand.

147 F.—26

Albert Hensing, the engineer in charge of the switch engine in question, testified that the accident occurred about 6:18 p. m.; that after the signal was given by McGinn the car moved about as fast as a man could walk; that McGinn got on top of the flat car, and coming in sight of him gave the signal to come ahead; he had started to go towards the front end when he came in sight of the engineer and kept giving him the signal to come ahead; he did not move the engine until after he received the signal to come ahead; he could see the flat car down ahead which he was going to pick up on the east side of Fifth street; he could not see any one approaching Fifth street cross ing from the north side of the track; he heard no outcry or moaning as the flat car passed over the crossing; he first heard that after the cab passed the cross-ing; he stopped and found Clarkson lying by the north rail between the rails, part of his left foot lying outside of the north rail had been cut off just above the ankle; he was lying about six feet east of the plank in the crossing; there were no signs that he had been rolled, or pushed, or dragged; there was blood on the rail, indicating that the wheel had gone over his ankle at that place; when they removed him McGinn and Funda were pres-ent, and also the fireman, and no others at that time: Clarkson said he saw the headlight,' but did not see the car, that he did not know what he was thinking about, and it was his fault. That after he was removed from the engine Monroe came there and said to, Clarkson: "Dad, do not talk so much." He did not talk any more after that. On cross-examination he said that the east end of the car when he started to go ahead was about 20 feet from the west end of the crossing; that when he started he could see most of the plank crossing on No. 2 track from where he sat; that McGinn stood side-ways holding the lantern so he could see it; he noticed no jolting of the car or engine as he passed over the crossing; he had cleaned the headlight of the engine that morning and it was bright.

Robert Yates, locomotive fireman, testified that the night of the accident he came across through the tracks and found his way around the turntable, where there is a pit about four feet deep; he could see cars on the transfer track 50 or 100 feet away; he saw the lights down at the point of the acci-dent and went down where the parties were; that when he got there they had Clarkson out from under the engine and Clarkson said: "I do not know what I was thinking about. I saw the headlight but did not see the car."

The defendant then introduced a number of witnesses, among them citi-zens of the town who made the experiments with the engine and flat car at the same place under like conditions, with the results hereinbefore stated, respect-ing the light showing the flat car. The evidence without contradiction showed that at the time of this accident there was an arc light about a block away, which threw some light upon this crossing. At the close of the evidence the defendant made request to the court for a directed verdict for the defendant, which, being refused, several requests were made for instructions which were denied; but, under the view taken of the merits of this case, it is not necessary to set out the refused instructions or the charge of the court in detail.

J. C. Cook (H. Loomis, on the brief), for plaintiff in error.

F. F. Dawley (N. M. Hubbard, Jr., and C. E. Wheeler, on the brief), for defendant in error.

Before VAN DEVANTER and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge, after stating the facts as above, deliv-ered the opinion of the court.

In the light of the foregoing facts let us examine the acts of neg-ligence imputed by the petition to the railroad company: (1) In failing to ring the bell or to give other warning to people about the crossing of the approach of the car. There was not only an entire

absence of evidence to sustain this allegation, but the evidence was uncontradicted that the bell was ringing. (2) In leaving said flat car standing within the limits of said Fifth street and so close to the usual traveled way of said street that when the engine was coupled onto the car, it was pushed over said traveled way without time or opportunity for persons using said traveled way to escape injury therefrom. There is no evidence in the record to support this charge. On the contrary, the evidence is clear that the end of the flat car, toward the street crossing, stood 15 or 20 feet from the south side of the street when coupled on to the engine. The "bump" of the impact in coupling the engine on the car was heard by the switchman, Funda, 100 feet away. The car did not move after this coupling until McGinn mounted to the top of the car with a lighted lantern and gave the signal to the engineer, and when it did move it was only at the pace of an ordinary walk, thus affording ample time and opportunity for any pedestrian approaching the crossing to observe the movement and avoid collision. (3) In running said car at an excessively high and dangerous speed over said crossing under the circumstances, it being after dark and no flagman being maintained at said crossing, said car being pushed ahead of said engine; in failing to have a flagman at said crossing to give warning of the approach of said car; and in failing to have any man or lantern upon the forward end of said flat car to warn persons using said street crossing of the approach of said car.

These allegations will be considered together, as they involve the same principles of law. The trial court, from its charge to the jury, seems to have entertained the view of plaintiff's counsel, that the failure of the defendant at the time of the accident to have a watchman stationed at the crossing, and to have a man with a lighted lantern "upon the forward end of the car," might be regarded as negligence per se. This is a misconception not unusual both of the office of such precautions and the reason for such rule or requirements. Hence, its arbitrary application, despite the facts of the particular case demonstrating its inapplicability. Whenever the reason for a rule does not apply to the particular instance it ceases to exist. If a city ordinance for instance requires the ringing of a bell or sounding of a whistle on the engine approaching a crossing where a person is injured, the omission to observe the ordinance in this respect is wholly immaterial, if as a matter of fact the party injured had notice of the approach of the engine; for the reason that the only purpose of such warning is to give notice of the approach of the car. Denver City Tramway Company v. Norton (C. C. A.) 141 Fed. 600, 607, loc. cit. So in respect of the duty to keep a flagman at such crossing, the purpose of which is to give warning to persons attempting to effect a crossing of the approach of cars. If the person in fact is aware of the approach, or there are other facts existing at the time and place which are equivalent to the presence of such watchman, his absence is wholly immaterial. Likewise in respect of a requirement that a light should be maintained at such cross-

ing; yet, if in fact there are present other lights of equal efficiency the absence of the particular light is of no consequence.

The only end to be subserved by the presence of a person at the forward end of the car is that he might observe the approach of a person at the crossing, and, by giving warning, possibly avoid a collision. But under the plaintiff's contention that the night was so dark that the deceased himself could not see the flat car, the switchman, if at the forward end thereof, would not have seen him; and, therefore, his presence or his absence under such conditions was quite immaterial. The presence of a lantern under such circumstances would alone have afforded the deceased any protection. If so, it would have been because of seeing the light he might have been warned thereby of danger. There being a lantern in McGinn's hand near the middle of the car, and other lights showing the presence of the car just as effectually as if McGinn had stood a few feet further forward, it met the whole requirement of any rule, express or implied, touching the due care of the law in this respect imposed upon the railroad company. Even if McGinn had been on the forward end of the car, under the deceased's statement that he did not see the flat car because the headlight of the engine blinded him, it likewise would have eclipsed by its glare the figure of McGinn had he been on the forward end of the flat car.

In its charge to the jury the court told them, in effect, that it was for them to determine from all the facts in evidence, whether the defendant was guilty of negligence in its failure to have some one there as flagman for the purpose of warning pedestrians that the train was approaching. This affords an apt illustration of that conservatism in charging juries of indulging in generalities which amount practically to mere abstractions, of little aid to the jury in discerning the application of the law to the particular facts of the case. The jury is thus left on the sea of conjecture to proceed without chart or compass to guide. At most this crossing was but little used at the hour in question, and then mainly by railroad employés familiar with the situation and the probability at any time of switching cars over this crossing. Most certainly, unless the absence of such flagman in some degree contributed to the injury, the fact was not a factor in the case; and the court should have so said. Suppose there had been a flagman at the crossing, what fact is there in evidence from which any jury should be allowed to infer that the life of Clarkson would have been saved? The place where such flagman would have been Funda was about with his lantern alight, in plain view of Clarkson, if then approaching the crossing. To a person of his knowledge of the switching habitually conducted there, and of the fact that no flagman was kept at the place, notice was given that a switching movement at that crossing was in process of execution, as much so as if a flagman had told him in so many words.

The next charge in the petition, and the one upon which most stress is placed by the plaintiff below, is as follows: In pushing said

car ahead, being in such position that the same could not be seen by said Clarkson, it being after dark. The manner of pushing the flat car over the crossing, the evidence shows, was in the usual way. Without contradiction the evidence is that when the switch engine was being employed at that place and time, it was for pushing either box or flat cars across that street. As a railroad man of long experience and observation, and his habitually passing the place, the deceased is presumed to have been familiar with the habit of such switching. When he approached the crossing, if he came from the north, as is contended, the headlight of the engine was ablaze, radiating wider and wider as the distance increased from the reflector. While the presumption arising from the instinct of self-preservation is to be indulged that the deceased, if approaching the crossing at or about the time of the movement of the car, exercised due care, yet, like any other presumption this one disappears when the truth appears. The light from the engine the law presumes Clarkson saw, for it required him to look, as he was conscious of approaching a place of danger. If he looked he could but see. If he did not see the light he was not looking. In either event the physical fact concludes him. Hayden v. M., K. & T. Ry., 124 Mo. 573, 28 S. W. 74. When a party advances a mere theory the court should see to it, as said by Judge Sherwood in State v. Dettmer, 124 Mo. 435, 27 S. W. 1117, that it "must not go counter to the physical facts in the case; for, if it does, neither courts nor juries are required to stultify themselves by disbelieving the immutable physical facts in the case."

Notwithstanding some minor differences in the version given by the witnesses as to the statements made by the deceased immediately after the accident, they are in practical accord that he admitted that he saw the headlight, and that he did not know what he was doing or thinking about, as he did not see the flat car. And there is little ground for doubting that he also said it was his fault. Touching this matter the court, in its charge to the jury, said:

"If Clarkson did make that statement, that is not conclusive upon him, nor is it conclusive upon the plaintiff in this action, because undoubtedly Clarkson was suffering pain at the time, and great mental suffering, and you should take that into consideration in determining its weight. Even if he made it, it is not conclusive that the fault was his, because we all know that a person in that situation is not to be held strictly to all that he may say under those circumstances."

This, it seems to us, was more than favorable to the plaintiff below. Its tendency was to minimize the effect of the admission.

The exclamations of persons in moments of sudden disaster are impressive. They are unpremeditated and ought to be presumed free from pretense. They reflect the truth of nature, first impulse. We fail to discover any incoherence, or external evidence of unconsciousness, to justify the rejection of the statements of Clarkson made within a few seconds or a minute after the accident. Of course his admission that his misfortune was his own fault would not necessarily conclude him, as his deduction might be incorrect; yet it was, if made, his own conclusion drawn from facts especially

within his knowledge. Like any other alleged admission, it was competent evidence against him or anyone claiming under him. His whole statement made at the time should be received, to be judged of by the triers of the fact. The charge of the court in this respect was hardly consistent with the fact that counsel for plaintiff below put in evidence the affidavit as to what McGinn, if present, would testify, which contained the statement that "said Clarkson said in my presence and hearing that he saw the headlight of the engine and did not see the car, and thought he had time to get across." And Funda, the other witness introduced on behalf of the plaintiff, testified that Clarkson said:

"Boys, it is all my fault. I have been railroading for a good many years. I saw that headlight, but I did not see the car. I thought I had time to get across, and I got caught before I got over. I did not notice the first car."

The plaintiff below having thus brought into the case the statement of the deceased without objection, she made it an issue of fact, and her counsel relies upon it in part for maintaining the verdict.

Having by its charge, practically destroyed the effect of deceased's statement beyond question the court should have granted the request of the defendant for a directed verdict. For eliminating the statement of the deceased, what have we in this record to support the verdict? The case would stand thus: Clarkson was found injured under the defendant's car; no one saw him approach, and no one witnessed the injury. While it is to be presumed from the nature of his injury that it was inflicted by the defendant's car or cars, whether he was lying down on the track or whether he had stumbled and fallen between the rails in crossing, at best would be matter of conjecture. Would such a state of facts, without more, sustain a verdict for damages against the railroad company? In Cincinnati, etc., Railway Company v. South Fork R. Co. (C. C. A.) 139 Fed. 528, 1 L. R. A. (N. S.) 533, Judge Lurton, in a forceful opinion, maintains that the maxim of res ipsa loquitur does not so apply even to the relation of carrier and passenger, that a mere injury to a passenger in transit is sufficient without more to warrant a finding that the injury resulted from the negligence of the railroad company. Clarkson was neither a passenger nor an employé. No contractual relation existed between him and the defendant railroad company. The company owed him no duty other than a public one. When, therefore, he or his representative asks to hold the railroad company for damages resulting from the fault of the company proof must be offered to show how he got under the car and how it was the fault of the railroad company.

The principal reliance to support the verdict is upon the case of Texas & Pac. Ry. Co. v. Gentry, 163 U. S. 353, 16 Sup. Ct. 1104, 41 L. Ed. 186. While there are lines of parallelism between that and the case at bar, they soon diverge and draw apart. We only know what the facts of the Gentry Case were from statements found in the opinion of the court, to the effect that while there was conflict in it there was sufficient evidence to render it necessary to submit the case to the jury; that evidence tended to show the following state of

facts: While Gentry was passing over the defendant's yards he was run down and killed by a flat car coupled in front of a locomotive used by the defendant for switching purposes; that the defendant failed to place any headlight, lantern, or other lights of any kind, or any other signal of danger, or any person to watch for employés, on said flat car to give warning of its character, or to sound the whistle or ring the bell of the locomotive as it approached the crossing; that the headlight on the locomotive was so arranged that its rays passed entirely over and beyond the flat car in front of the locomotive; and that the defendant failed to have any lantern or light at the point in or about its yards or the crossing; and that the engine used by the company for switching purposes on the occasion was an ordinary heavy road engine with a pilot in front, and was not suitable, but unfit, for such purpose; and that the defendant did not have knowledge of such use of an ordinary engine, with a flat car coupled in front of it for switching purposes; that he was unable to see the flat car on account of the darkness of the night, and by being blinded by the headlight on the engine, and had not heard the whistle or bell of the locomotive, not knowing anything of the use and danger of the locomotive and flat car as an appliance for switching purposes. From which it appears that the railroad company in moving the flat car did so with a road engine, with the headlight so far above the flat car in front that its rays did not disclose the presence of the flat car; that there was no one on the flat car or about there with a lighted lantern, nor were there other lights about the crossing, and that the employment of such a road engine for such purpose was so unusual as to mislead the injured party. As everyone knows, whoever observed such engines, the headlight in a road engine is considerably higher from the ground than that of a switch engine; and, therefore, the light did not fall upon the flat car at all. But, in the case at bar, the evidence does not admit of dispute that the engine employed was the usual switch engine. That the headlight fell on the flat car so as to plainly disclose four-fifths—about 24 feet—of the forward part of the car to full view. That there was on top of the flat car, near or a little forward of the middle, a brakeman with a lighted lantern in his hand, who stood in the full glare of the headlight, who was plainly seen in that position by Funda, the plaintiff's witness, and as demonstrated by experiments made by a number of uncontradicted witnesses, both the flat car and the presence of McGinn on top of it were plainly visible at least 50 feet from the car to anyone approaching the crossing. There was also an arc light in the adjoining block, which threw sufficient light on this crossing to disclose the presence of an object like a flat car thereon. In addition to this, Funda was passing to and fro about this crossing with a lighted lantern in his hand. It would seem to be a physical impossibility for Clarkson not to have discovered the presence of the flat car unless he was positively heedless, or his mind was occupied about something else, or more likely because he had grown careless from familiarity with the situation. Unless it is to be assumed that

he supposed McGinn was in some way suspended in midair, four or five feet above the ground, he must have known he was standing on something moving in front of the engine. And when this is considered in connection with his knowledge of the habit of the defendant in switching flat cars across that street he was bound to assume that such movement was in process of execution—as the bell was ringing indicating movement. The point where he lay when found—several feet beyond the plank way in the street—corroborates his statement that he thought he could get around ahead of the engine; and we entertain little doubt that in that way he lost his life. Thus furnishing another illustration of the fact that rather than await, in perfect safety, the passing of a car at such crossing, to save a few seconds of time some people will run a race with the car as to which shall first cross, and usually lose on the hazard.

In any permissible view of the facts and the law of this case, this verdict cannot stand except upon the license of a mere conjecture, as needful to be restrained as a disguised confiscation. The court should have granted the request of the defendant for a directed verdict.

It results that the judgment of the Circuit Court must be reversed, and the cause remanded, with directions to grant a new trial.