# GRAHAM v. OGDEN UNION RY. & DEPOT CO.

No. 4618.   Decided March 8, 1928.   Rehearing Denied March 17, 1928.
(266 P. 504.)

George H. Smith, J.V. Lyle, R. B. Porter, and Dana T. Smith, all of Salt Lake City, and C. R. Hollingsworth, of Ogden, for appellant.

N. J. Harris, of Ogden, for respondent.

THURMAN, C. J.

Plaintiff brought this action to recover damages for a personal injury caused by the alleged negligence of the defendant company.

It is alleged in the complaint that Twenty-Eighth Street in Ogden City, Utah, is a public thoroughfare, one of the principal streets of said city, and extensively traveled; that the defendant company maintains a large number of railroad tracks over and across said street, and "that at all times mentioned herein the defendant did propel and operate a large number of freight and passenger trains along the said railroad tracks and over the said Twenty-Eighth street crossing, and did at all times use the said tracks as a part of its railroad yards, and did constantly use the same for switching its engines, trains, and cars, and for moving the same from place to place, and in doing so passed continually over the said crossing, and did often have its engines, trains, and cars moving in different directions and over its different tracks all at the same time; that the defendant did during all of said times have its engines, trains, and cars standing upon, or near said crossing, thereby obstructing the view of travelers going along and upon said highway, as they approached the said crossing, so that they were often unable to see trains and cars approaching said crossing from either direction by reason whereof, and, by reason of the running of trains in different directions and upon different tracks simultaneously, travelers often became confused, and were often, without any fault on their part, placed in danger of being run over and injured by defendant's engines and cars."

It is then alleged that, by reason of said facts and conditions and the danger to travelers passing over the said crossing, it was necessary that flagmen be stationed and maintained at said crossing to flag and stop defendant's engines and cars while people were passing over said crossing to prevent the frightening of teams and consequent dangers therefrom; that defendant negligently failed to maintain any flagman at said crossing, and that, on August 29, 1923, plaintiff was traveling on said street, with due care and caution, towards the defendant's said railroad

tracks, and riding in a one-horse wagon driven by one Ross Gray; that, as they approached said railroad tracks, they were compelled to wait for a period of ten minutes by reason of said crossing being obstructed by defendant's trains and cars crossing the same; that, after the passage of said trains and cars, and when said crossing had become clear, plaintiff and her said driver started forward to cross said tracks; that it was the duty of defendant at said time to keep said crossing clear and permit plaintiff and her said driver to pass safely over said tracks; that, as plaintiff and her said driver who were traveling east approached the west track, and just as they had reached the same, the defendant, by its agents, servants, and employees, negligently, carelessly, willfully, and wantonly caused a locomotive engine which had been standing on said track, a short distance north of said crossing, to be suddenly started, and, with steam being emitted in large quantities therefrom, said engine was rapidly propelled southward over said crossing, and immediately in front of the horse attached to said wagon, thereby causing said horse, wagon, and occupants to be enveloped in a dense cloud of steam, thereby causing said horse to become frightened, and causing it to back up and overturn said wagon, throwing plaintiff therefrom with great force and violence, and pinning her under said wagon.

It is then alleged that, by reason thereof, plaintiff suffered great and serious injury; that her back and ankle were sprained and bruised, and her whole body made sick, lame, and sore, causing a great shock to her nervous system, so that she was compelled to remain in bed for a long time, and by reason of said shock to her nervous system she was caused to suffer, and for a long time did suffer, great pain and distress in body and mind, all to her damage in the sum of $999, for which sum she prayed judgment.

The defendant, answering, denied every allegation charging liability against the defendant, and affirmatively alleged that the said Ross Gray, the driver of said horse and wagon,

was careless and negligent in driving said horse too close to the engine operated by said defendant.

The jury to whom the case was tried rendered a verdict for the plaintiff for the amount prayed for, and from the judgment entered thereon by the district court the defendant prosecutes this appeal.

The cause originated in the city court of Ogden City, and from the judgment entered therein an appeal was taken to the district court.

The errors assigned by appellant here relate, chiefly, to the admission of evidence over defendant's objection, the giving of certain instructions to the jury, and the refusal of the court to give certain instructions requested by the defendant. Before considering these alleged errors, we will briefly state the main features of the evidence relied on by respondent in support of the judgment.

The evidence shows that Twenty-Eighth street in Ogden City and the railroad tracks crossing the same are substantially as alleged in plaintiff's complaint. Plaintiff resided on Twenty-Eighth street, about a block west of the west track of the defendant. On the day of the accident she had occasion to travel east on Twenty-Eighth street and was being conveyed by Ross Gray, in a one-horse wagon. Gray and plaintiff's little girl sat on the front seat of the wagon, while plaintiff and her little boy sat on a cushion seat on the floor of the wagon, in the rear. Plaintiff testified that a freight train was passing south over one of the tracks east of the west track as she was leaving her house, and that an engine stood on the west track partly across the cement sidewalk on the north side of Twenty-Eighth street. The engine was pointed toward the south. When the wagon in which she was riding reached a point about 33 feet west of the west track, the freight train, going south, had not entirely passed over the street, and they were compelled to wait at that point for about five minutes before the caboose

of the train crossed over. While waiting there, she noticed the engine on the west track, and saw a man sitting in the cab on the right side. She said the man saw her and the vehicle in which she was riding. The west track and the track on which the freight train was running came together a short distance south of Twenty-Eighth street. As soon as the caboose passed over Twenty-Eighth street, the driver of the vehicle started to drive eastward. It was an upgrade, and the horse moved slowly. She did not see whether the engine on the west track started at the same time or not, but she testified that "when the horse got right close to the west track he suddenly stopped," and the first she knew the steam came all over the wagon and its occupants; that it was so thick she could not see at all "for the smoke." The horse commenced to push the wagon backwards, and pushed it to a point about twice as far from the track as was the point where they waited for the freight train to pass (which was about 66 feet from the west track). At that point the wagon turned over. Plaintiff was thrown from the wagon, and the wagon bed fell across her back and ankle. She stated that the pain in her back was "enormous"; that she could not sleep at night for quite a while; that, after the accident, she was helped up, and, to use her own language: "When I got out from under the wagon my head was just reeling, just like it was swimming around and around. It looked like I was walking this way and that way, and a lady came and helped me home," and plaintiff "went straight to bed." Plaintiff testified her back "felt pretty bad"; that it hurt her still. Her ankle was swollen and blue—"a kind of a bluish black," and her back was the same way. Her husband told her how it looked. She was in bed for two weeks. She then got up "sitting around," and, when she felt dizzy or sick from being up, she would go back to bed. She said she had never had those dizzy spells before; nor had she had any trouble with her back or ankle before. The dizzy spells had not left her yet. After the injury, they came on quite often when she stood up, or

"stooped around." On several occasions, particularly enumerated and described, she had become unconscious. She never noticed the dizzy spells when she was in bed, but when she stirred around too much they came on. She stated that when she felt a dizzy spell coming on she had to lie down and keep still. At the last trial in the city court she became unconscious. When she regained consciousness, she was at home.

Plaintiff's husband testified on plaintiff's behalf, and substantially corroborated her testimony as to her injuries, and especially as to her dizzy spells and spells of unconciousness. Plaintiff had been treated by different physicians for the injury to her back, but had obtained no relief.

Such, in substance, was the testimony of the plaintiff as to the cause and nature of her injuries, so far as the same is material to the issues presented for our determination. Her testimony as to the nature of her injuries was not objected to by the defendant, nor was a motion made to strike it out, but, when the evidence closed, defendant requested the following instruction:

"You are instructed that there is no competent evidence that the dizzy spells and/or spells of unconsciousness from which the plaintiff testifies she suffers were caused by, or were the result of, the injuries she sustained in the accident, and you cannot allow her any damages for them."

The requested instruction was refused. Appellant excepted thereto, and relies on the exception here.

The reason assigned by the appellant for not objecting to the testimony of plaintiff and her witnesses as to her dizzy spells and unconsciousness is that the defendant considered such evidence competent as far as it went, and supposed it would be supplemented by expert testimony tending to show that the dizziness might have resulted from the physical injuries described by plain-

tiff. But no expert testimony was offered, and consequently appellant's contention is that the testimony of plaintiff and her witnesses as to her dizziness and unconsciousness, standing alone, is incompetent and insufficient to prove that such dizziness and unconsciousness resulted from the physical injuries complained of. In support of defendant's contention, the following authorities are cited and relied on: *Atchison, Topeka & Santa Fe R. R. Co.* v. *Melson,* 40 Okl. 1, 134 P. 388, Ann. Cas. 1915D, 760; *Willet* v. *Johnson,* 13 Okl. 563, 76 P. 174; *Trapnell* v. *Red Oak Junction,* 76 Iowa 744, 39 N. W. 884; *Hoey* v. *Metropolitan St. R. Co.,* 70 App. Div. 60, 74 N. Y. S. 1113; *Houston* v. *Traphagen,* 47 N. J. Law, 23; *Moore* v. *St. Louis Tr. Co.,* 226 Mo. 689, 126 S. W. 1013; *St. Louis & S. F. R. Co.* v. *Criner,* 41 Okl. 256, 137 P. 705.

In the Atchison, Topeka & S. F. R. R. Case, supra, the plaintiff was injured while stepping from the defendant's passenger train when it reached plaintiff's destination. It is alleged in the complaint that plaintiff fell on her back, striking both her back and leg against a step of the coach or the ground— she was unable to tell which, skinning and bruising her left leg or hip and injuring her back, spine, and kidneys, so that she was unable to get up and walk; that she suffered great physical pain and mental anguish, etc. It is also alleged that about one month afterwards she suffered a stroke of paralysis in her left leg, side, and arm, and since said time has been deprived of their use; that said paralysis was the result of said injuries; and that she was informed that another stroke would follow which would be fatal. The Supreme Court, on appeal, held there was no evidence to show that the stroke of paralysis was due to the injuries she received in debarking from the train.

One vital distinction between that case and the case at bar is that in that case the paralysis occurred a month after the accident, while here the dizziness and "swimming" of the head occurred as soon as plaintiff was helped to her

feet from under the wagon. It occurred intermittently thereafter down to a recent date before the trial. She had never been afflicted that way before.

In *Willet* v. *Johnson,* supra, the plaintiff was injured in an assault and battery. She alleged inflammation of the uterus, fallopian tubes, bladder, and its appendages, as a result of the battery, from which she suffered great physical pain and mental anguish. The only testimony offered in support of these allegations was that of plaintiff and her daughter, both of whom, as the court says, were unskilled in such matters, and not possessed of extraordinary intelligence, and none whatever of a professional character. A physician sworn in the case testified that the injury of which plaintiff complained might have been received by a number of things, which he enumerated. When asked what did cause the plaintiff's injuries, he said: "I don't know." The court held that the evidence failed to show the cause of the injury from which the plaintiff was suffering.

That case sheds no light on the question we have to determine. It seems hardly probable that an unskilled witness, without extraordinary intelligence would know anything definite about such matters, as the plaintiff and her daughter testified concerning, and, when we add the fact that a physician who treated the plaintiff some time afterwards was unable to give an opinion as to the cause of her injuries, the decision of the Supreme Court is not at all surprising.

In *Trapnell* v. *Red Oak Junction,* supra, plaintiff, while walking on a sidewalk, was injured to some extent by a fall. The next day and following days she complained of pain in her left breast, and liniment was applied to relieve it. Competent surgeons said it was a form of cancer, and, upon their advice, the breast was amputated. It was testified by competent physicians that a blow or bruise might have been the exciting cause of the growth, but that such result would only have followed in case the germ of the

disease existed in the system before the injury. It was contended by appellant that there was no evidence to justify instructions as to the cause of the injury. The Supreme Court, in passing upon the question (76 Iowa 746, 39 N. W. at page 885), said:

"Plaintiff did not testify that she received a blow or bruise on the breast in her fall, and we have been unable to find in the record any evidence which would warrant the finding that she did sustain such injury. True, it was proven that she suffered pain in the breast after her fall. But it was not proven that she had not suffered such pain before that. There was evidence, also, which tended to prove that the enlargement of the breast began after that, although plaintiff, who is the one most likely to know when it began, did not testify to that fact. But these facts, standing alone, do not prove that the breast was bruised or injured at the time of the fall. The physicians testify that the disease which developed in the breast was hereditary, and there was no conflict in the evidence on that point. While an injury by external force might have caused it to develop, it may also have developed without such cause."

It is not necessary to comment upon that case. It is clearly distinguishable from the case at bar.

In *Hoey* v. *Metropolitan St. R. Co.,* supra, the second paragraph of the syllabus reflects the opinion of the court. It reads:

"Where plaintiff's intestate was injured while a passenger on a street car by a collision of cars, and soon thereafter was stricken with acute pulmonary tuberculosis, from which disease the jury found he died, and there was no evidence that the disease was caused by or resulted from the accident, judgment, in action against the railway company to recover damages for such death, should be directed for defendant."

In *Houston* v. *Traphagen,* supra, plaintiff, when six years old, fell down a flight of stone steps leading from a public street in Jersey City into a cellar owned and partly occupied by defendant's testator. It was found sometime afterwards that the child had what is known as "Potts' disease of the

spine," which had given excessive pain for years, and finally resulted in an angular curvature of the spine, a permanent incurable deformity. Plaintiff was 19 years of age when the case was tried. A verdict was rendered for $10,-000. The trial was largely a controversy between experts appearing as witness in the case, and is not helpful on the question before us. The third paragraph of the syllabus states the law of the case:

"When it is claimed that the fall produced or excited disease, it should appear, in order to recover damages for the results of the disease, not only that the fall was a possible cause of the disease, but other causes should be so excluded and the circumstances should be such as to leave a reasonable inference that the fall was the actual cause."

In *Moore* v. *St Louis Transit Co.*, supra, plaintiff sued for injuries to his back, legs, kidneys, and nervous system, causing him great bodily pain and mental anguish, alleging that such condition would continue. The answer of defendant was a general denial. The plaintiff sought to prove loss of sexual power. Appellant objected to the offered testimony, claiming it was not admissible because not specially pleaded. The court discusses the question at length, and reviews many decisions of that court. Then, after discussing the facts of the case before the court (226 Mo. 704), at page 1017, says:

"While it is true the plaintiff testifies that he has had no sexual passion since he was hurt, we take it that, in order to authorize that character of testimony, it is essential to show by some witness competent to testify upon that subject that such loss of sexual power was at least a natural result of his injuries."

Later on in the opinion (226 Mo. 705), on the same page, the court says:

"But in the case at bar, as heretofore indicated, the evidence falls short of showing in the first place that impotency or the loss of sexual passion resulted from any of his injuries, and, in the second

place, the evidence fails to show that the impotency or loss of sexual power was a natural result of such injuries. It follows from this, that in view of the failure to make a satisfactory showing that the loss of sexual power resulted from the injuries received and was but the natural result of such injuries, the court should have sustained the motion of the defendant upon the trial to strike out that part of his testimony in reference to that subject."

In *St. Louis & S. F. R. Co.* v. *Criner,* supra, the plaintiff alleged injury through the negligence of defendant railway company. This case is close to the border line. It is not necessary to review it at length, in view of the conclusion we are compelled to reach. We will, however, quote the second headnote, which states the general nature of the injury:

"Where a female passenger suffers a miscarriage some two or three days after arrival at her journey's end, and where, during the course of the journey, the carrier may have been guilty of negligence, but where there was no competent evidence that the subsequent miscarriage was caused by or resulted from the negligent acts of the railroad, a verdict based partly on proof of miscarriage and attendant suffering cannot be sustained."

In none of the foregoing cases, except perhaps the last, can it be said with any degree of assurance that the injury sought to be proven was the natural and probable consequence of the physical injuries alleged. In most, if not all, of them the injury sought to be proven was of such a nature that it could hardly be contended a layman of only ordinary intelligence would be competent to prove the fact. In the instant case it cannot be successfully contended that the dizziness of which the plaintiff testified, occurring as it did just as soon as she got on her feet, was not a natural and probable consequence of the fall with its accompanying shock to her nervous system.

If the defendant had limited its request to the spells of dizziness and unconsciousness that occurred long subsequent to the accident, it would have presented a more serious ques-

tion. But, as the request was presented, it included the dizziness that occurred at the very time of the accident, as soon as she arose to her feet. Our conclusion is that the court did not err in refusing the request.

It is also contended by appellant that there is no evidence in the case showing that the steam which plaintiff says was emitted from defendant's engine, and which it is claimed frightened the horse, was unnecessary in the operation of defendant's railroad. Appellant cites many authorities to the effect that in cases of this kind it is incumbent upon plaintiff to show that it was not necessary to emit the steam in the operation of the railroad. We believe that that proposition as a matter of law is generally, if not universally, sustained by the authorities.

The proposition is not controverted by the plaintiff. The question therefore is, Was there any evidence that the steam emitted was unnecessary in the operation of the road? In this connection we will first state that Ross Gray, the driver of the horse and wagon, strongly corroborated the plaintiff's testimony as to the emission of the steam, the quantity thereof, and its effect upon the horse. While neither the plaintiff nor Gray testified directly that the emission of the steam was unnecessary, the engineer who operated the engine, in effect, did so testify. In fact, he denied that any steam at all was emitted. He described specifically the parts of the engine from which the steam emanates: First, there is the safety valve on the top of the boiler; second, the blow-off cock underneath the boiler; and, third, the cylinder cocks on both sides of the engine, about fourteen inches above the ground. The safety valve discharges steam automatically when a certain pressure is reached. In order to open the blow-off cock a man must get outside the cab on the running board to open the cock. The cylinder cocks are operated by a lever in the cab which is under the control of the engine crew, particularly the engineer. The cylinder cocks and the blow-off cock emit steam straight out from

the side. None was emitted from either place on the occasion in question. The engineer testified specifically that it was not necessary to emit steam from the cylinder cocks at said time, and the only conclusion that can be drawn from his testimony, considered as a whole, is that it was unnecessary to emit steam at all, and that therefore none was emitted. But, as before stated, both plaintiff and the driver of the wagon testified in the most positive terms that steam was emitted from the engine in large quantities, and in effect testified that that was one of the causes which resulted in the accident and consequent injury to the plaintiff.

The last assignment of error necessary to be specifically reviewed presents a more serious question for respondent. It is alleged in plaintiff's complaint:

"It was necessary that flagmen be stationed and maintained at the said crossing to flag and stop defendant's engines and cars while people were passing over said crossing, thereby preventing the frightening of teams with the consequent dangers therefrom, and enabling the travelers on said highway to pass over the said crossing with safety, and that by reason thereof it became and at all times herein named was the duty of the defendant to maintain flagmen at the said crossing to protect plaintiff and all others who might be lawfully upon the said highway."

It is then alleged, in substance, that defendant disregarding its duty in that respect failed and neglected to maintain a flagman at said crossing, and that by reason of said negligence said engine was not signalled or stopped, etc. Defendant objected to any evidence along that line, contending that the defendant was under no duty to have a watch man there to stop a train from going over the crossing. The plaintiff, however, testified there was no watchman there, and that nobody was on guard. The question was again raised at the close of the trial by certain requests of defendant for instructions to the jury, which requests the court refused. The requests so refused were four in number, all to the effect that the defendant was under no duty to

maintain a watchman at the crossing for the purpose of flagging its trains or stopping such trains for the purpose of protecting travelers on the highway.

It is conceivable that there may be instances in which it would be the duty of a watchman or flagman to flag a train and stop its progress in order to prevent an injury to a person or persons on the highway. But such cases, in the nature of things, must be infrequent, and limited largely to instances in which traffic on the highway is congested, or where other conditions exist which render warning to travelers impossible or of no avail.

The authorities are uniform, so far as we have investigated the question, to the effect that, if it becomes necessary to have a watchman or flagman at all at a crossing, his primary duty is to warn travelers on the highway at a crossing of the near approach of a train, and not to stop the train for the purpose of allowing travelers to cross the track. The reciprocal rights of railroad companies and travelers at a crossing are well stated by Elliott on Railroads (3d Ed.) § 1646, as follows:

"The company possesses the right to the use of its tracks over highway crossings and the public retains the right to the use of the crossing as a highway. Neither has the right to interfere with a proper use of it by the other. Their rights have been said to be 'mutual, coextensive, and in all respects reciprocal,' but this statement must be qualified in that, owing to the momentum of trains, confinement of their movement to a track, and the necessities and public nature of railway traffic, the railway company has the right of way and the traveler must wait until the train, the coming of which he knows, or ought to know, has passed. The prior right of passage is in the railway company."

Further on in the same section the author says:

"The right of precedence of the company, however, does not impose upon the traveler the whole duty of avoiding collisions, but both parties must exercise care and diligence in regard to their respective duties and are charged with the mutual duty of exercising reasonable care to prevent injury. Each must make reasonable and proper ef-

forts, in view of the circumstances, to foresee and avoid collisions, and each may, in a limited extent, rely upon the other to exercise such ordinary care."

See, also, the following cases cited by appellant: *Cross v. Illinois Cent. Ry Co.* (Ky.) 110 S. W. 290; *Carnochan v. Erie R. Co.*, 159 App. Div. 406, 130 N. Y. S. 514, 144 N. Y. S. 1108; *Chicago, Milwaukee & St. P. Ry. Co. v. Clarkson* (C. C. A.) 147 F. 397.

In *Carnochan v. Erie R. Co.*, supra, a question was raised somewhat similar to the question under review. In the course of its opinion the court said:

"The plaintiff's claim that the defendant should be charged with negligence because the flagman did not leave the crossing and go up the track and signal the approaching train to stop is equally untenable. In the first place, he did not and could not know of the near approach of the train until he heard the electric bell or the train whistle, and the proof is that then he ran up the track and made a futile attempt to stop it. His duty, however, was at the crossing to protect the public from trains approaching in both directions. While he was up the track to head off an east-bound train in order to save an automobile, a train might have come along on the west-bound track and killed a number of human beings. His sole duty under his employment, and the instructions given him, and the rules by which he was guided in his work, was to remain at the crossing and warn the public of the approach of trains, and to leave that post of duty would be negligence for which his employer would be liable if an accident was occasioned thereby."

The other cases cited are to the same effect.

We are of opinion the defendant was entitled to the instructions requested or instructions substantially similar. The court gave no instruction to the same effect, but did instruct the jury to the effect that if they found by a preponderance of the evidence that the defendant was guilty of negligence in *one or more* of the particulars charged in the complaint, and that by reason of such negligence plaintiff sustained injury and damages,

as alleged in the complaint, their verdict should be in her favor, if such negligence was the proximate cause of her injury. Such instruction authorized the jury to consider whether or not there was a flagman or watchman present to stop the engine and allow plaintiff to cross the track.

We are of the opinion that the court erred in refusing to instruct the jury as requested, and that the error was prejudicial.

Other errors are assigned, but they are without merit.

Judgment reversed, and cause remanded for a new trial, at respondent's cost.

CHERRY, STRAUP, HANSEN, and GIDEON, JJ., concur.