ST. LOUIS & S. F. R. CO. v. CUNDIEFF.†

(Circuit Court of Appeals, Eighth Circuit. May 11, 1909.)

No. 2,903.

1. COURTS (§ 431*)—FEDERAL COURTS—PLEADING IN CIVIL ACTIONS AT LAW—
   CONFORMITY TO STATE PRACTICE—ACTIONS PENDING ON ADMISSION OF
   OKLAHOMA.
   Section 1. Schedule, Const. Okl., which provides that "No existing rights,
   actions, suits, proceedings, contracts or claims shall be affected by the
   change in the form of government, but all shall continue as if no change
   in the form of government had taken place," applies to forms of proce-
   dure, and the provision of section 2, that the laws in force in Oklahoma
   Territory shall be in force in the state until changed or repealed, does not
   make such laws relating to pleading applicable to causes pending in the

---
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

†Rehearing denied August 23, 1909.

courts of Indian Territory at the time of the admission of the state and thereupon transferred to the Circuit Court of the United States, which continue to be governed by the laws in force in the Indian Territory.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 431.*]

2. WITNESSES (§ 268*)—CROSS–EXAMINATION—SCOPE.

Where a witness, introduced by the plaintiff in an action for a·personal injury by being struck by a railroad train, testified that he saw the accident and was one of the first to reach plaintiff after the injury and described the surroundings, movements of the trains, etc., the defendant was entitled on cross-examination to show by the witness statements made by plaintiff at the time as a part of the res gestæ.

[Ed. Note.—For other cases, see Witnesses, Dec. Dig. § 268.*]

3. RAILROADS (§ 348*)—INJURY AT CROSSING—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

Plaintiff, while walking across a railroad track at a crossing on a dark and foggy evening, was struck and injured by a freight train which backed against him and was moving at a speed of not more than 5 or 6 miles an hour. He was a railroad man and was familiar with the crossing. . Witnesses introduced by him testified that they saw the train at a distance of not less than 30 feet, and there was no obstruction to prevent plaintiff from hearing or seeing it if he had stopped and looked and listened before stepping on the track. Held, that he was chargeable with contributory negligence as matter of law, which precluded his recovery; that in view of the other testimony and of the physical facts his own testimony that he did so stop and look and listen was not entitled to credence and did not create a conflict of evidence.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 348.*]

Amidon, District Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Oklahoma.

J. Lionberger Davis (D. T. Flynn, T. G. Chambers, and C. B. Ames, on the brief), for plaintiff in error.

Charles B. Rogers, for defendant in error.

Before HOOK, Circuit Judge, and RINER and AMIDON, District Judges.

RINER, District Judge. This was an action to recover damages for personal injuries. The action was originally brought in the United States Court for the Northern District of the Indian Territory, prior to the time of the admission of the state of Oklahoma into the Union, of which this district became a part. After the admission of the state of Oklahoma, the case was removed to the Circuit Court of the United States for the Eastern District of Oklahoma. The original petition was filed in the United States Court for the Indian Territory on the 12th of June, 1907, and the railroad company filed its answer October 12, 1907. The answer denied the allegations of the petition and also set up as a defense contributory negligence on the part of the plaintiff. October 12, 1907, the day the answer was filed, the plaintiff in the court below filed a motion to strike from the answer portions thereof.

Oklahoma was admitted into the Union November 16, 1907, and on December 11, 1907, the defendant in the court below filed its petition for removal, and the case was removed to the Circuit Court. On April

17, 1908, the case come on for trial, the motion to strike was not called to the attention of the court, and the trial proceeded on the petition and answer. At the conclusion of the evidence the defendant moved the court to direct a verdict for the defendant upon the ground that under the pleadings, as well as the evidence, the plaintiff was not entitled to recover. The motion was overruled, and an exception saved. The jury returned a verdict in favor of the plaintiff, and on the 20th of April, 1908, the defendant filed a motion for judgment notwithstanding the verdict, on the ground that the pleadings in the case showed that the defendant was entitled to a verdict because no reply had been filed to that part of the answer setting up as a defense the contributory negligence of the defendant.

It is conceded by the plaintiff in error (hereafter referred to as the "railroad company") that prior to the admission of Oklahoma the Arkansas practice prevailed in the Indian Territory, and that under that practice no reply to the answer was required, but all affirmative allegations of the pleading were treated as in issue. The schedule of the Constitution of Oklahoma (sections 1 and 2) provides as follows:

"Section 1. No existing rights, actions, suits, proceedings, contracts or claims shall be affected by the change in the forms of government, but all shall continue as if no change in the forms of government had taken place.

"Sec. 2. All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitations or are altered or repealed by law."

The statutes of the territory of Oklahoma, prior to its admission as a state (St. 1893, § 3980), provided:

"When the answer contains new matter, the plaintiff may reply to such new matter, denying, generally or specifically, each allegation controverted by him, and he may allege in ordinary and concise language, and without repetition, any new matter not inconsistent with the petition, constituting a defense to such new matter in the answer, or he may demur to the same for insufficiency, stating in his demurrer the grounds thereof; and he may demur to one or more of such defenses set up in the answer, and reply to the residue."

And that (St. 1893, § 4006):

"Every material allegation of the petition not controverted by the answer, and every material allegation of new matter in the answer, not controverted by the reply, shall, for the purpose of the action, be taken as true."

It is contended by the railroad company that these statutes, by virtue of the constitutional provision above referred to, governed in the trial of this case, and that therefore the railroad company was entitled to a judgment on the pleadings for the failure of plaintiff to reply to the affirmative defense set up in the answer.

It is insisted by the railroad company that as soon as statehood became effective the Oklahoma Code of Procedure applied to all cases then pending in the Indian Territory courts. It is conceded, however, that, if the issues had been joined under the Indian Territory practice, the Oklahoma Code would not relate back and require further proceedings; but it is said that the issues were not joined because there was pending a motion to strike portions of the answer, up to the time

the plaintiff and defendant announced that they were ready for trial.

We do not think the issue upon the question of contributory negligence, to which, under the Oklahoma Code, it was necessary to reply, was governed by the statutes of Oklahoma. The issue was raised without a reply under the Arkansas practice, which, at the time the answer was filed, prevailed in the Indian Territory. The motion to strike never became operative, because it was never called to the attention of the court, and by going to trial without doing so the plaintiff, of course, abandoned it. Furthermore, it is entirely clear from an examination of the motion, which is set out in the record, · that, if it had been sustained, there would still remain in the answer a specific denial to every material allegation in the complaint and also the defense of contributory negligence. It is insisted by the railroad company that the provision of the Constitution to the effect that no existing rights, actions, suits, proceedings, etc., shall be affected by the change in the forms of government, does not relate to the forms of procedure. We think this contention cannot be sustained.

The rule of constitutional construction is that the ordinary and common meaning of the words used, in the light of other provisions of the Constitution, must be adopted. The preamble to section 1 of the schedule to the Constitution of Oklahoma provides:

"In order that no inconvenience may arise by reason of a change from the forms of government now existing in the Indian Territory, etc., it is hereby declared as follows."

And then follows the provision above referred to, together with other provisions, declaring process issued prior to the admission of the state under the authority of the territory of Oklahoma, or under the authority of the laws in force in the Indian Territory, valid and giving it the same force and effect as if issued in the name of the state.

Construing all of these provisions together, we are of opinion that they do not change, and were not intended to change, the method of procedure in cases pending in the courts of Indian Territory and of the territory of Oklahoma, but that the civil cases pending in the Indian Territory should, after statehood, continue under the law in force in the Indian Territory, and under that law no reply was required, prior to statehood. We do not think that the provision of the Constitution relied upon by the railroad company so changes the situation as to make a reply necessary.

The second assignment of error relates to the refusal of the court to permit Dean, a witness for the defendant in error (hereafter referred to as the "plaintiff"), on cross-examination to testify that the plaintiff at the time he received his injury stated to the witness that he was standing on the main line watching the train going east on the passing track, and that the injury was caused by this condition.

The theory upon which this witness was asked these questions on cross-examination, as suggested by counsel, was: That he was one of the first persons to reach the plaintiff after the accident; that he came to the plaintiff almost immediately after the accident; that he had testified to the condition and surroundings, and to remarks made by some of the employés of the railroad company at the time; and

that therefore the entire transaction and everything else relating to these conditions, including plaintiff's statements, constituted a part of the res gestæ and were admissible on cross-examination. Counsel concede the rule to be that the cross-examination should be confined to the subject-matter about which the witness has testified on direct examination, but insist that as he had testified in the direct examination that he saw the plaintiff as the train was backing over him, that at that time he (the witness) was about 100 feet distant from the plaintiff, that he immediately went to his assistance, that he and a witness by the name of Pershing were the first ones to reach the plaintiff after the accident, that soon thereafter three trainmen came up, and one of them made some remark about the accident, and that the witness had also described the surroundings, conditions, movement of the trains, place where the plaintiff was found, and all the things which he saw, therefore it was entitled to this testimony, not only on the ground that it was evidence against the plaintiff, but that being made immediately after the accident, and to the first person who reached him, the statements were a part of the res gestæ, and that where the witness, on his direct examination, went into a part of the facts concerning the accident and the condition in which the plaintiff was found, it was permissible, on cross-examination, to show the statements made by him as a part of the transaction itself. We think this testimony was competent, and that it was error to exclude it. It is insisted by the plaintiff that the railroad company could have had the benefit of the testimony by making the witness its witness. That is quite true; but, as we view the case, it was not bound to do so. New Jersey Steamboat Co. v. Brockett, 121 U. S. 637, 7 Sup. Ct. 1039, 30 L. Ed. 1049; Sargent v. Home Benefit Association (C. C.) 35 Fed. 711; Travelers' Protective Association v. West, 102 Fed. 226, 42 C. C. A. 284.

The third assignment of error presents the question of contributory negligence. The record shows: That on the 2d of April, 1907, the railroad company was engaged in the business of a common carrier and operating a line of railroad through the town of Vinita in the Indian Territory; that this line of railway was a part of a trunk line of railroad over which is operated a large number of freight and passenger trains; that on the evening of the 2d of April, 1907, between 7:30 and 8 o'clock, plaintiff attempted to cross the tracks on Scraper street in the town of Vinita; that the street runs in a general northerly and southerly direction and crosses the railway tracks at right angles; that in attempting to make this crossing the plaintiff was struck by a train backing down on the main line and suffered the injuries complained of. The tracks of the railroad company run approximately east and west, and at Scraper street crossing there are four tracks; the most southerly track being known as "track No. 7," the next one north of that the "house track," the next one north of the house track the "main line," and the next one north of the main line the "passing track." The distance between track No. 7 and the house track, as disclosed by the record, was 111 feet; between the house track and the main line, 55 feet; and between the main line and the passing track, 16 feet. The record shows: That on the evening in question there were two freight trains going east, one closely fol-

lowing the other; that these trains had orders to take the siding at Vinita to permit a freight train coming west to pass; that the first east-bound train passed east on the main line until it crossed Scraper street; that the second train east bound took the passing track which connects with the main line some distance to the west of Scraper street; that the train first to arrive after crossing Scraper street backed down west on the main line, crossing Scraper street and onto a siding, designated in the record as "track No. 3," which was west of the crossing, for the purpose of clearing the main line for the west-bound train. The testimony shows: That, as this train was backing across Scraper street, the second train to arrive, which was on the passing track, was pulling forward in an easterly direction, crossing Scraper street; that the plaintiff was proceeding north on Scraper street to his home, which was on the north side of the railway tracks; and that he arrived at the main line crossing just at the time the train on the main line was backing over the crossing, and was struck by the cars.

He testified: That the train was backing at a rate of speed not to exceed five or six miles an hour; that there were no lights on the rear end of the train, a box car being attached to the train at the rear end of the caboose; that there was no obstruction whatever to prevent the plaintiff from seeing the train which injured him, if it was sufficiently light for him to see it. Had the accident occurred in the daytime, instead of in the evening, the case would not have required discussion, as the rule is well established that where the physical facts are such that the party injured, if he had looked, could have seen the train, the court would disregard his statement that he did look and failed to see it.

The plaintiff testified: That the evening was dark and foggy; that he stopped before going upon the track, but just how far distant from it is not shown, and looked east and west, and could not see the train, although he testified that he did see the train going east on the passing track before he attempted to cross the main line. The case was tried entirely upon the plaintiff's evidence. Three witnesses besides the plaintiff saw the accident. The plaintiff testified that before he crossed the house track, which was 71 feet south of the passing track, he could see the train on the passing track going east. If this is true, it is difficult to .understand why he could not see the train on the main line, as there was nothing between him and that train to obstruct his view, and the main line was nearer to him than the passing track. He further testified that, before reaching the main line, he saw a brakeman on the second car ahead of the caboose on the train on the passing track, so that it must have been light enough, according to his own testimony, to enable him to count the cars between the brakeman and the caboose. If the light was sufficient to enable him to do that, it seems to us that it was sufficient to enable him to see the train on the main line, which was nearer to him, if he had stopped and looked as he testified he did.

Weed, one of his witnesses, testified: That he could see the train backing down on the main line; that, when he first saw it, he was at a point about halfway between track No. 7 and the house track, or,

as shown by the record, about 110 feet distant from the main line; and that the first thing that attracted his attention to it was that he heard it.

Pershing, another witness, who was going east between the passing track and the main line, saw the train when it was 30 or 35 feet south of him.

Dean, another witness, who was accompanying Pershing, saw the train just as the engine was passing over the plaintiff, and he testified that at the time he saw the train it was 30 or 35 feet distant from where he was.

Thus we have the testimony of three of the plaintiff's witnesses, all less favorably situated than he to observe the train, who saw it distinctly at least at a distance of 30 feet.

Plaintiff was a railroadman, familiar with this crossing, and alleged in his petition that it was a part of the trunk line, and that trains were frequently passing and repassing over this crossing. With nothing whatever to obstruct his view or hearing, his statement that he stopped and looked seems to us contrary to all reasonable probability and in direct opposition to the physical facts as disclosed by the record. It is a matter of common knowledge that a freight train moving on a railroad track makes a noise, and, as it only takes two or three steps at most to cross a railroad track, this train, backing at the rate of five or six miles an hour, must have been within a few feet of him at the time the plaintiff attempted to cross.

The testimony, aside from his, taken in connection with the physical facts, shows clearly, we think, that, with the exercise of ordinary care upon his part, this accident could not have happened. There is no evidence tending to show that the wind was blowing, or that there was anything to interfere with his hearing, even if he could not see, and it seems incredible that he could not hear a train of freight cars moving on a track so near to him as to overtake him before he could take two steps. Under these circumstances, we think his testimony that he stopped and looked is entitled to no credence and does not create a conflict in the evidence. C. & N. W. Ry. Co. v. Andrews, 130 Fed. 65, 64 C. C. A. 399, and cases there cited.

A person attempting to cross a railroad track must look and listen. A mere casual observation does not satisfy the rule. In the case just cited, the court, speaking through Judge Van Devanter, said:

"The general rule is that a person coming upon or over a railroad crossing is required to use for his own protection ordinary care—such care as men ordinarily exercise under the same or similar circumstances. The amount of care which will satisfy this requirement is necessarily adjusted to and varies with the danger to be guarded against. As the danger, or the probability of injury therefrom, increases, so do men ordinarily increase the care which they exercise for their own protection. If, therefore, when plaintiff approached the crossing, smoke interfered with the view along the tracks to the west, and prevented him from readily or plainly determining whether a train was coming from that direction, he was at once apprised of the increased danger, and it became his duty to exercise greater caution and vigilance for his own safety than would have been required otherwise."

In Chicago, R. I. & P. Ry. Co. v. Pounds, 82 Fed. 217, 27 C. C. A. 112, Judge Thayer said:

"A railroad track is in itself a warning of danger, because trains may be expected to pass at any moment. Therefore the courts have repeatedly declared that a person is, as a matter of law, guilty of contributory negligence if he drives upon a crossing without making a vigilant use of his senses of sight and hearing. If either of these senses is impaired, or for any reason cannot be exercised to advantage, he ought to be more vigilant in the use of the other." Railroad Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542; Schofield v. Chicago, etc., Ry. Co., 114 U. S. 615, 5 Sup. Ct. 1125, 29 L. Ed. 224; Northern Pac. Rd. Co. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014; Garlich v. Railroad Co., 131 Fed. 837, 67 C. C. A. 237; Tomlinson v. Railway Co., 134 Fed. 233, 67 C. C. A. 218; C., B. & Q. Ry. Co. v. Christina Munger (decided at this term) (C. C. A.) 168 Fed. 690.

These cases and many others from the Supreme Court and from this court apply this rule. In most of the cases holding what is apparently a contrary doctrine, it will be found upon investigation that there were physical and topographical obstructions to the faculties of sight and hearing; but in this case there is nothing of that kind.

Conceding that all of the acts of negligence charged against the railroad company are true, yet we think that the contributory negligence upon the part of the plaintiff is so conclusively shown by this record that the court erred in not sustaining the motion to direct a verdict.

The judgment must be reversed, with instructions to grant a new trial.

AMIDON, District Judge (dissenting). In my judgment the foregoing opinion departs widely from the rule established by the Supreme Court defining the duty of travelers at railroad crossings, and imposes upon them the whole burden of avoiding collision.

The accident occurred at the town of Vinita, in Indian Territory, a city having between 3,500 and 4,000 inhabitants. The railroad passes through the city from east to west. The main business district lies immediately south of the right of way, and extends along a street parallel therewith. About one-half of the population resided north of the tracks, and Scraper avenue, upon which the accident occurred, was the principal thoroughfare used by them in passing to and from the business district. The defendant has four tracks over this street. The southermost is an industry track. North of this, 111 feet, is a freight siding. North of that, 55 feet, is the main track, north of which, 16 feet, is a passing track. The accident occurred on the evening of April 2, 1907, between 7:30 and 8 o'clock. The night, according to plaintiff's testimony, was "a very dark, kinder cloudy, foggy night." This statement is in no way contradicted, but is confirmed by the testimony of another witness. Cundieff had been to the business district and started to go to his home north of the track. He approached the crossing on the east side of Scraper avenue. At the time a freight train was moving east on the northernmost track, obstructing his passage. When he got near to the second track, he saw three lights on the freight depot platform immediately west of Scraper avenue, and a signal was given by one of these lights which would be a proper direction to a train to move ahead. The freight train answered the signal with two blasts of the whistle, from which the plaintiff understood that it was about to pull out of the city. When within six or eight

feet of the freight siding, being the second track from the south, he looked both east and west to see if any train was approaching, and seeing none he passed over that track. Before going upon the main track he again stopped and looked for trains, and was unable to discover any. He says: "I stopped and looked again on the main line to cross it." At this time the train that was passing east on the north track was about to clear the crossing as he saw by the lantern of a brakeman who was hanging from the side of the car next to the rear. He proceeded over the crossing, expecting to reach the north track at the west side of the street by the time the train had cleared it; but as he was passing over the main track he was struck by the rear end of a string of cars that was being backed westward over that track by a locomotive at the other end, and received the injuries for which this action is brought. The track inclined slightly to the west, and the train was moving five or six miles an hour. There was no light at any place on this string of cars, nor any trainmen to warn the public of its approach. One witness speaks of seeing a caboose in the train of which these cars were a part, at the time it pulled into the city; but every other witness testified positively that there was no caboose in this string of cars, nor any lights displayed upon it. The crossing was not lighted. No bell was rung or whistle sounded.

Upon these facts the court holds that Cundieff was guilty of contributory negligence as a matter of law in failing to discover the cars by which he was injured. This conclusion is reached from the evidence of four witnesses testifying that they were able to see one or both of the trains in question at distances ranging from 30 to 71 feet. From this as a basis the conclusion is held to be inevitable that if Cundieff had looked he must have seen the car that struck him in time to have avoided the collision. In my judgment this conclusion is not warranted, because the observations were made under widely different circumstances.

The plaintiff testified that before he crossed the house track, which was 71 feet south of the passing track, he could see the train on that track going east. "If this be true," the court says, "it is difficult to understand why he could not see the train on the main line, as there was nothing between him and that train to obstruct his view, and the main line was nearer to him than the passing track." At the time he saw this train on the passing track, however, the train on the main track must have been east of the crossing and wholly outside his range of vision. He was not asked to state how long he stood at the house track, or between that and the main track, waiting for the train that was moving east to clear the crossing; but a fair inference from the evidence is that considerable time must have elapsed. There is nothing in the record that would justify a belief that he looked past the train that injured him when he saw the train on the north track. I assume, however, that the language of the court quoted means that, if Cundieff could see the train on the passing track at a distance of 71 feet, it would have been possible for him to see the train on the main track in time to avoid the collision. It seems to me, however, that this overlooks two controlling facts: First, the train on the passing track pre-

sented itself to Cundieff broadside. It was moving as he was thus looking in the direction of it, and might very well have been disclosed to his view first by the different cars passing between him and lights north of the track. Common experience would show that a train under such circumstances would be visible when a train that was approaching the observer showing nothing but a dark end would not be discovered. Second, Cundieff's attention might have been first directed to the train on the north track by the sound which it produced, and his attention thus have been focused upon it. It is an elementary law of optics, as well as a matter of common knowledge, that it is possible to see an object of whose presence we have been made aware by its sound, when it would not have been seen if the attention had not thus been drawn to it by the certainty of its presence. There was no opportunity, however, for Cundieff thus to discover the train that was moving on the main track at the time of the injury. The long train that was passing east on the north track was, he says, making considerable noise. His ears were first filled with its roar. Any other similar sound coming within the range of his hearing would have been naturally attributed to that train as its cause.

It is next urged that because Cundieff discovered the brakeman on the side of the train on the north track, and stated that he was on the second car from the rear, it must have been light enough, according to his own testimony, to enable him to count the cars between the brakeman and the caboose. "If the light was sufficient to enable him to do that," the opinion says, "it seems to us it was sufficient to enable him to see the train on the main line, which was nearer him." It is easy for me to understand that Cundieff might have discovered the length of the train by its sound, and thus estimated the number of cars in it, or that he might have discovered the rear of the train by the appearance of lights in the northern part of town, as the train moved eastward, and ceased to obstruct his vision. If the rear car of this train was a caboose (about which the evidence is in conflict), of course, that would clearly indicate to an observer the number of cars between the brakeman with his lantern on the side of the train and the caboose. This is all of the testimony of Cundieff from which the inference is drawn that he ought to have discovered the train on the main track, and it seems to me wholly insufficient to justify the inference as a matter of law.

A witness by the name of Weed testified that he saw the train that injured Cundieff from a point south of the main line on Scraper avenue; but he states that he first discovered it by the light of the train on the north track. His testimony on that subject is as follows:

"Q. Had you seen the train that was supposed to have run over him?
"A. I did not only by the light of the other train."

In another part of his evidence this witness testified that he also heard the train. His testimony is badly confused as to where he stood at the time he made these observations; but he gave as his final judgment that he was not more than 30 feet south of the main track. Three features of his evidence impress me: First, he was made aware of the train causing the injury by the lights north of it; second, he

was a sufficient distance from both trains so he could easily have distinguished the sound of the one from the other; and, third, he looked at the train from the side and not from the end. That he was able to see this string of cars under such circumstances is therefore to me very slight proof that Cundieff ought to have seen them under his essentially different conditions.

There were two other witnesses by the name of Pershing and Dean. At about the time of the accident they were traveling east on the right of way north of the north track. They crossed over between this track and the main track about 150 feet west of Scraper avenue. They then saw the string of cars that had struck Cundieff. At that time it was passing on a spur leading off to the southwest immediately west of Scraper avenue. They testified that they were able to see these cars at a distance of from 30 to 35 feet, and from this the court draws the inference that Cundieff could have seen them for a like distance, and was negligent in failing to do so. In my judgment these witnesses occupied an entirely different position from that which he occupied: First, there was nothing to distract their attention from the sound of these cars, and they may have first discovered them by their noise, and then directed their gaze to ascertain its cause. Second, the plat that was introduced in evidence shows that these cars passed between these witnesses and the three lanterns of the trainmen that were standing on the platform of the freight depot, and they might have discovered the presence of the cars by their cutting off these lights. Third, the cars passed between them and the main business part of the city, and for this reason they could easily have discovered the cars by their intercepting the lights in that part of the town. Finally, the cars were presented to them nearly broadside. They therefore occupied an entirely different relation to the cars from that which Cundieff occupied. It must also be borne in mind that their estimate as to the distance was made in the night, and was for this reason subject to serious error. It further appears that these witnesses estimated the number of cars as eight; but this may have been simply an opinion based upon the distance between the rear of the cars and the light of the locomotive which they say they saw as it passed over Cundieff, and disclosed him lying on the ground, or they might have discovered the number of cars as they passed to Cundieff, going along opposite the train. So their statement that there were about eight cars in the string is no proof of what could be seen by Cundieff.

It is next urged that the string of cars which struck Cundieff must have made considerable noise, which he should have heard; but, as already stated, it would have been perfectly easy for Cundieff to confound any noise made by these cars with the noise of the train that was passing on the track immediately north. It is said that it only took two or three steps to cross the track; but all the authorities agree that the law does not fix any specific point from which the traveler must look. Elliott on Railroads, § 1166(a); Cleveland, etc., R. R. Co. v. Miles, 162 Ind. 646, 70 N. E. 985. Cundieff says that after he crossed the house track, and before he entered upon the main track, he looked for trains upon that track. Just how many feet he was

away, or how rapidly he moved, is wholly a matter of conjecture. He says he thought he would have to swerve a little to the west in order to get around the rear of the train that was passing on the north track. He was waiting for the crossing to be cleared, and his movements may have been slow in view of that fact. Such evidence is clearly for the consideration of the jury. Zwack v. N. Y., L. E. & W. R. R. Co., 160 N. Y. 362, 366, 54 N. E. 785. Certainly it is departing, in my judgment, widely from any previous decision, for the court to hold as a matter of law that Cundieff was negligent in not hearing the train that was moving towards him very slowly without any sound of bell or whistle, while another train was passing within a few feet.

It seems to me that all the facts upon which the court finds the plaintiff guilty of contributory negligence as a matter of law are simply features proper for the consideration of the jury in determining the issue. The rule which declares that when the "physical facts" show that the traveler must have discovered the train if he had looked and listened, his negligence becomes a matter of law, can properly be applied only when the physical facts are themselves unambiguous. Even in Pennsylvania, where the duty of the traveler is more burdensome than in any other state, contributory negligence will not be declared as a matter of law unless the evidence clearly shows that the plaintiff must have discovered the train if he had looked and listened. Davidson v. L. S. & M. S. Ry., 171 Pa. 522, 33 Atl. 86; Kuntz v. N. Y., C. & St. L. R. R. Co., 206 Pa. 162, 55 Atl. 915. The doctrine has never been enforced, so far as I can learn, except in cases where the train approached a crossing in the open day, with an unobstructed track, or in the nighttime when it exhibited a headlight or some other conspicuous illumination, or when a single train was within hearing, and causing sufficient noise to make it physically impossible that the traveler would not have heard it if he had listened. After a careful examination of the authorities, I feel confident in the assertion that the rule mentioned has never before been applied to a dark freight train moving over a public thoroughfare without any warning bell, whistle, or light, while another train was passing. Here it is not "physical facts," like a headlight at night, or a train on an open track in the daytime that form the ground of the court's decision, but evidence touching how far cars could be seen under circumstances widely different from those which surrounded the plaintiff. In the Houston Case, 95 U. S. 697, 24 L. Ed. 542, where the rule was first stated, the deceased had a clear view of the train for three-fourths of a mile. The headlight of the engine was burning. It was also bright moonlight, and the train, which was moving rapidly, created a loud noise. Later cases following this decision have all exhibited trains whose approach to the crossing was manifest with equal clearness. In the present case the night was very dark and foggy. The crossing was obstructed by a long freight train that was moving over it. As the passage clears, the plaintiff goes forward, after looking and listening for danger, when a string of freight cars is backed down upon him on a parallel track. The grade is slightly favorable, so that in all probability no noise is made by the exhaust of the locomotive. The sound of the cars is con-

cealed by the roar of the train that is passing on the adjoining track. No light whatever is exhibited, nor is any bell rung or whistle sounded. I ask with all candor what circumstance is here wanting which ought to be present in order to make a case proper for the consideration of a jury? There is no absolute rule of law that the traveler's failure to see a train is negligence. Whether it is such must depend upon the circumstances. Is it the purpose of this court to establish as a rule of law that a pedestrian cannot in any case recover for injuries suffered at a railway crossing? That his failure to discover a train, however negligent its management, establishes contributory negligence as a matter of law? In every one of the hundreds of cases in which a recovery has been sustained, it was physically possible for the traveler to have discovered the train. Whether his failure to make the discovery showed a want of such care as reasonably prudent men are accustomed to exercise in going upon crossings was held to be a question for the jury; but the majority in the present case seem to me to apply the rigid rule that, if it can be said upon a calm consideration of the evidence that it was physically possible for the plaintiff to discover the train, his failure to do so establishes his legal negligence. The enforcement of such a rule devolves upon the traveler the whole burden of avoiding collisions at crossings. That, in my judgment, is not the law. The duty is mutual. Railroad companies are bound to warn the public by some signal of the approach of their trains. I, of course, am well aware that the omission to appeal to the ear of the traveler by the ringing of the bell and the sounding of the whistle will not excuse him from the use of his eyes; and if the situation is such that by looking, as a prudent man would have looked under all the circumstances, he might have discovered the train, his failure to do so establishes his negligence. That, however, is not the present case. Here the railroad company not only omitted the signals which appeal to the ear, but also all signals which appeal to the eye. The train approached the crossing without any outward indication of its presence. Railroads, by years of customary practice, have taught the public to believe that a train approaching a crossing in the nighttime will exhibit a light or sound a bell, or both. Can it be held to be negligence on the part of the public that it relies upon this invariable custom? When there is no light and no signal, is it the duty of the public to assume that the company is likely to be guilty of an act of criminal negligence, and to institute a search in the dark to find a train? That would require, not ordinary, but most extraordinary, care. In not one time in a million will a train be pushed over a public crossing in the nighttime without one or both of the usual warnings. It has been repeatedly declared by the courts that to do so is an act of gross and criminal negligence. If the present accident had resulted in death, instead of injury, the trainmen, under the laws of Oklahoma, as well as under the laws of a majority of the states of the Union, would have been guilty of manslaughter for doing an act so imminently dangerous and so utterly regardless of human life. Can railroads by an invariable practice drill the public as to what may be expected in the movements of trains at railway crossings, and then when they depart from that practice say that the traveler is guil-

ty of negligence because he relied upon the practice? The senses discover what experience has taught them to expect. If an object is accustomed to exhibit certain conspicuous features, the eye, when looking for the object, looks for those features only, and, if they are not shown, the mind by an involuntary judgment calls back the eye from further search. Any other process would make the ordinary movements of life impossible. We should have to pause at every step to conduct a multitude of original investigations instead of being guided by the quick, involuntary judgments that are the results of common experience. When Cundieff looked up the track and saw no light and heard no bell or whistle, he had a right to believe that no train was approaching, and to act accordingly. He was not called upon to turn a searching gaze into the night to see if he could not descry a dark train creeping down upon him. Prudent men do not do that. If the law requires them to, it requires what is unusual, unnatural, and unjust. It overlooks the mutual and reciprocal duties of the railroad company and the traveler. It exonerates the former from the consequences of its criminal negligence, and requires the public to use extraordinary care to avoid the unusual and unexpected dangers arising from such negligence.

In the federal courts there are two well-defined classes of cases on the subject of accidents at crossings. In the one the train approaches the crossing in the open day with a clear track, or in the nighttime exhibiting a headlight or some other equally conspicuous illumination. This class of cases starts with Houston v. Railroad Company, 95 U. S. 697, 24 L. Ed. 542, which has already been fully described. To it belongs Schofield v. Chicago, Milwaukee & St. Paul Ry. Co., 114 U. S. 615, 5 Sup. Ct. 1125, 29 L. Ed. 224 (daytime, with a clear view of the train for 70 rods, with nothing to distract the attention); Elliott v. Chicago, Milwaukee & St. Paul Ry. Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068 (open day with clear view of the train, and plaintiff, a section boss, walked in front of the cars, and evidence affirmatively showed that he neither looked nor listened); Northern Pacific v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014 (open day, a clear view of the track for 300 feet, and affirmative evidence that plaintiff did not look, but drove upon the track with his head down). In all of these cases plaintiff sought to recover because the train failed to ring the bell or sound the whistle. The court held that, if he had used his eyes, he must have seen the train, and that he was guilty of contributory negligence in not looking. To this class all the cases cited in the prevailing opinion will be found upon examination to clearly belong.

The second class involves situations in which, the physical facts being shown, it was uncertain whether the plaintiff was negligent in failing to discover the train. Most of them, like the present case, involved the passing of a string of cars over railway crossings in the nighttime without light or sound. This class of cases also had its beginning in the same volume as the Houston Case, and is first illustrated by Continental Improvement Co. v. Stead, 95 U. S. 161, 24 L. Ed. 403. There a string of cars were thrown over a suburban crossing by a flying switch without any warning of their approach, and the case was

held to be one for the jury. The court states forcibly the duty of railroads to notify the public by some warning of the approach of their trains to crossings, and that, if no warning is given which appeals clearly either to the eye or ear, the traveler cannot be held guilty of contributory negligence in failing to discover the train. This case, like the Houston Case, was a unanimous opinion of the court. Its doctrines have been applied in the following cases: D. L. & W. L. Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213 (a flying switch in the nighttime); Grand Trunk v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485 (an obstructed crossing); Texas & Pac. Ry. Co. v. Cody, 166 U. S. 606, 17 Sup. Ct. 703, 41 L. Ed. 1132 (a traveler on foot, and dark freight train backed over a crossing in the nighttime); Baltimore & Potomac R. R. Co. v. Cumberland, 176 U. S. 232, 20 Sup. Ct. 380, 44 L. Ed. 447 (a reversed locomotive without headlight, but showing a lantern—a much stronger case for the defendant than the present).

There are two other cases in the Supreme Court whose facts are so nearly similar to the facts of the case here under review that I think they should be more fully discussed. Texas & Pac. Ry. Co. v. Gentry, 163 U. S. 353, 16 Sup. Ct. 104, 41 L. Ed. 186. Gentry was an engineer residing at Big Springs, Tex., a division point. He started to go to his engine in the yards between 8:30 and 9 o'clock on the evening of March 13th. He traveled by a path leading under the staging of a coal chute. The distance between the coal chute and the track upon which he was killed was 13 feet. While traveling over this space, he had a clear view of the track. A road engine with a flat car attached in front of it was being temporarily used in the yards for switching purposes. Its headlight was burning brightly, and illumined the half of the car farthest from the engine. Gentry stepped in front of the car and was killed. The main defense was contributory negligence. The statement of facts in the decision of the Supreme Court is not clear. Owing to what was said in C., M. & St. P. Ry. Co. v. Clarkson, 147 Fed. 397, 77 C. C. A. 575, as to the evidence upon which the Gentry Case was decided, I have obtained a copy of the original record from the clerk of the Supreme Court, and examined the testimony for the purpose of ascertaining precisely the facts that were there before the court From this it appears that the plaintiff in support of her case introduced the testimony of 15 railroadmen. Two of these stated that the flat car could not be seen. One did not testify at all upon that subject. Ten stated either that it would be "difficult to see such a car under the circumstances," or "a person standing in front of the engine opposite the track could not easily see the flat car." Three witnesses (one of whom was a brother of deceased), on the evening of the accident, made a test with the same engine and the same car at the point where Gentry was killed, to ascertain whether the car would be visible. One of these witnesses stated the result of that experiment as follows:

"We passed under the coal chute as we supposed L. G. Gentry did, and had the engine go down the main line. I could see the flat car. I cannot say whether I would have seen it or not had I not known it was there, and had I not been looking for it."

The brother of the deceased stated:

"I do not think that an unsuspecting person would have seen the car as the headlight shone over it and blinded the eyes. I did see the car, because I knew it was there, and was looking for it."

The third witness, a brother engineer, testified as follows:

"If a person was standing in front of said engine, the flat car could be seen with difficulty. I was standing by the side of the car when the engine and car passed me about 5 or 6 feet from me. Of course, I knew the car was there, and it was very little difficulty for me to see it; but a person not knowing it was there might not have seen it easily. If a man knew the car was there, he could very easily see it by the headlight. Standing by the side of the track the headlight of the engine would have no effect upon the vision of the person, I don't think; but standing in the middle of the track, and looking at such headlight, it might have had a dazzling effect upon the vision. About half of the car was illuminated by such reflected light from the headlight. The end of the car was much more illuminated than back towards the middle of the car and towards the engine. The end of the car farthest from the engine was in a brighter light and clearly visible."

With a single exception plaintiff's witnesses all agreed that the headlight would illuminate about one-half of the car.

The remarkable feature of the decision is this: The defendant requested the following instruction, which was refused:

"You are instructed that it is the duty of an employé or any other party about to cross a railroad track to look and listen for passing engines, cars, or trains, to ascertain whether or not same are approaching before going upon the track, and if a party fails to exercise such care he cannot recover. You are therefore instructed that if the deceased, L. G. Gentry, by looking or listening, could have known of the approach of the engine and car, in time to have kept off the track and prevented the injury to himself, and if he failed to do so, you will find for the defendant."

There was nothing in the charge as given which embodied the substance of this request; but the court held that its refusal was not error. The Houston Case in 95 U. S. 697, 24 L. Ed. 542, and other decisions of the Supreme Court declaring the duty to look and listen before going upon the track, were urged upon the attention of the court, and in distinguishing the instant case from those cases the court said:

"But the present case did not admit of or require an instruction upon this special subject. There was no evidence upon which to rest such an instruction. As already stated, no one personally witnessed the crossing of the track by the deceased, nor the running of the flat car over it. Whether he did or did not stop and look and listen for approaching trains the jury could not tell from the evidence. The presumption is that he did, and, if the court had given the special instruction asked, it would have been necessary to accompany it with the statement that there was no evidence upon the point, and that the law presumed that the deceased did look and listen for coming trains before crossing the track."

It may be doubted whether all this language can now be regarded as consistent with later decisions of the Supreme Court. It would seem as if the physical facts, in combination with the evidence above referred to, made such a showing as to render the requested instruction proper. What the opinion of the Supreme Court in this case, however, does teach with unmistakable emphasis, is that "physical facts," in order to establish contributory negligence as a matter of law, must

be unambiguous. The facts themselves, without argument, must show that, if the traveler had used his faculties of hearing and seeing, he must have discovered the train. The plaintiff's evidence in the Gentry Case established beyond any reasonable doubt that, if Gentry had looked for the car, he could have seen it. His own brother, as the result of the test made on the same evening as the accident, bore testimony to that effect; but the court held that the car was not clearly visible, and therefore that the rule declared in the Houston Case could not be applied. In the present case the dark end of the train that injured the plaintiff was certainly as obscure as the car that killed Gentry. Here, too, the court is not left to the feeble presumption that the plaintiff exercised care. He appeared as a witness, and testified positively that he looked and listened for the train, and was unable to discover its presence. The car that struck the plaintiff was obscured by reason of the very dark night. The car that struck Gentry was obscured because of the radiance of the headlight. In the Gentry Case the Supreme Court held that it was not even proper to call the jury's attention to the rule requiring the traveler to look and listen. Here the jury, upon a charge to which the defendant took no exception, have found in plaintiff's favor. Surely we cannot reverse their finding without rendering a decision that is clearly in conflict with the opinion of the Supreme Court in the Gentry Case.

The latest decision of the Supreme Court (Baltimore & Potomac R. R. Co. v. Landrigan, 191 U. S. 461, 24 Sup. Ct. 137, 48 L. Ed. 262) is directly in point on its facts. The defendant's four tracks were laid in Virginia avenue, in the city of Washington, and were crossed by South Capital street. The crossing was well lighted by four gas lamps at each of its corners, and further by two electric lights which were sufficiently near to throw considerable light upon the place. The flagman's box at the crossing obstructed the view to one standing outside the gates; but inside the gates the view along the track was clear. The accident occurred about midnight. At the time a limited passenger train was running out of the city over the crossing. The deceased was killed by a "runaway" Pullman car which was being switched in the yard, and had broken loose by reason of a defect in the coupling. The tracks were slightly inclined, and this car moved slowly down toward the crossing about as fast as a man could walk, in the direction opposite to that of the passenger train, and reached the crossing at the same time as the locomotive of that train. It was a vestibuled car, and the end towards the crossing had a brilliant lamp in the vestibule which clearly illuminated the end of the car and the track for some distance in front of it. The evidence shows that Landrigan was struck at the east side of Capital street, and the car approached from the west, so it was at least clearly visible while it was passing over the entire street, and to one standing inside of the gates it was visible for a much greater distance. Landrigan had been employed for eight years as an assistant boss in the defendant's roundhouse. His home was north of the railroad tracks, and he had been accustomed to pass over the crossing daily during the period of his employment. He stepped upon the track on the night in question in front of the Pullman car, and was struck by it

and killed. At the conclusion of the evidence the defendant moved for a directed verdict upon the ground of his contributory negligence, which was denied, and the case submitted to the jury, who returned a verdict in favor of the plaintiff. There is not a circumstance in the present case justifying a reversal of the judgment which was not present in that case, and there are several circumstances tending to show that the plaintiff there was negligent, which are not here present: First, the crossing was well lighted so as to leave no room for doubt that the car could have been seen if the traveler had looked in its direction. Second, the brilliant light in the vestibule of the sleeper is another strong circumstance showing that the car was plainly visible as it approached the point of the accident. Third, the only evidence tending to show that Landrigan looked and listened before going upon the track was the presumption of care. In the present case there is the same presumption coupled with the positive evidence of the plaintiff that he did look and listen. Landrigan's attention, the same as plaintiff's here, was distracted by another train upon a parallel track. If that case was properly affirmed, surely the present should be.

I shall not further prolong the opinion to examine cases in detail, but shall simply cite others of a similar nature in which judgments for the plaintiff have been sustained upon evidence less cogent than is shown by the present record: Texas & Pac. Ry. Co. v. Cody, 166 U. S. 606, 17 Sup. Ct. 703, 41 L. Ed. 1132; B. & O. R. R. Co. v. Griffith, 159 U. S. 603, 16 Sup. Ct. 105, 40 L. Ed. 274; D., L. & W. R. R. Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213; Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485; C., R. I. & Pac. R. R. Co. v. Sharp, 63 Fed. 532, 11 C. C. A. 337; McGhee v. White, 66 Fed. 502, 13 C. C. A. 608; C., M. & St. P. Ry. Co. v. Donovan, 160 Fed. 826, 87 C. C. A. 600; Henavie v. N. Y. C. & H. R. R. Co., 166 N. Y. 281, 59 N. E. 901; Judson v. Central Vt. R. R. Co., 158 N. Y. 597, 53 N. E. 514; Zwack v. N. Y., L. E. & W. R. R. Co., 160 N. Y. 362, 54 N. E. 785; Smedis v. B. & R. B. R. R. Co., 88 N. Y. 13; French v. Railroad Co., 116 Mass. 537; Canning v. B., R. & P. Ry. Co., 168 N. Y. 555, 61 N. E. 901.

The Houston Case was decided in 1877. For more than 30 years the courts have rigorously enforced the rule requiring the traveler to look and listen. During that period the roll of death and accident at crossings has steadily increased from year to year. I have no disposition to abate the rule in any degree, when the facts to which it is properly applicable are present; but in my judgment the duty rests upon railroads to apprise the traveler in some way clearly of the approach of trains, and sound public policy forbids their exemption from liability when they fail to do so.