## LANG v. BYRAM et al.

Circuit Court of Appeals, Eighth Circuit.
October 7, 1929.

No. 8515.

George G. Chapin, of St. Paul, Minn. (Herbert P. Keller and Bruce J. Broady, both of St. Paul, Minn., on the brief), for appellant.

A. C. Erdall, of Minneapolis, Minn. (F. W. Root and C. O. Newcomb, both of Minneapolis, Minn., on the brief), for appellees.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and MARTINEAU, District Judge.

KENYON, Circuit Judge. At a grade crossing in St. Paul, Minn., appellant's automobile collided with a train of cars on the Chicago, Milwaukee & St. Paul Railway, operated by appellees as receivers, with the usual disastrous results to the automobile and its occupant. This action for damages resulted. The trial court at the close of the evidence directed a verdict for appellees on the ground of contributory negligence of appellant. The only question in the case is whether under the circumstances contributory negligence was a question of fact for the jury, or of law for the court. The accident occurred after dark February 10, 1927, shortly after 7:30 p. m. The place of the accident was Seventh street in the city of St. Paul, which is crossed by a double track of the Milwaukee Railway Company at about the point where Colborne street intersects and crosses Seventh street. Seventh street runs in a diagonal direction, from the business center of St. Paul to the northeast, toward Ft. Snelling to the southwest. Colborne street runs due north and south, and intersects West Seventh street at the crossing. The street railway track on Seventh street crosses the two railroad tracks. The north railroad track is the west-bound main line, and the south track is the east-bound main line. Crossing gates were maintained at this crossing, but at the time of the accident they had been inoperative for a couple of days by virtue of being frozen, and during these two days employés of the railway company had been working to put them in condition for operation. There was a flagman at the crossing when the gates were not working, and he was performing his duties there at the time of this accident. There was also a flagman employed by the street car company. While these railroad tracks were main line tracks, they were used by transfer trains and switch engines. The train which struck appellant's automobile was a transfer train coming from the west on the south track, and had a standard headlight on the engine. Appellant was proceeding southwest. There were obstructions to his view to the west, viz. a one-story frame house and a signboard. The signboard, which was high enough to obstruct the view of an approaching train, ran parallel with the railroad tracks 12 feet north of the north rail of the west-bound main line track. The east end of the signboard was 15 feet west of the edge of the Seventh street sidewalk, and extending along the signboard was a platform 4 feet wide. The sidewalk was 9½ feet wide. The southwest corner of the house was 17 feet from the nearest rail of the nearest track. The building was parallel with Seventh street, and was 8 feet back from the sidewalk. From center to center of the railroad tracks was 14 feet. The north rail of the east-bound track was 26 feet from the signboard and parallel therewith, and the nearest rail of that track was 31 feet from the southwest corner of the house referred to. The crossing gate on Seventh street northeast of the track was 40 feet from the north rail of the north track and 60 feet from the north rail of the south track measured along the

curb line. Appellant in approaching the crossing looked to the right at the place where the gate was located, which would be the direction to observe a train coming from the west on the east-bound track, but at the point where he looked his vision was obstructed by the frame house and the billboard. He had no unobstructed view of the track to the west until he passed the billboard. After that he could have seen an approaching train on the east-bound track for a considerable distance. He had lived on West Seventh street for 8 years prior to the accident, had owned an automobile for 6 years, had gone over the crossing two or three times a week during all the time he had lived there, and was thoroughly familiar with it. On the night of the accident, he approached the crossing at a speed of some 18 miles an hour, looked to the right at a place where he could not see an approaching train, and, after passing this point, looked to the left and did not look again to the right, but proceeded at about 12 miles per hour over the crossing, and was struck by the transfer train moving about 10 miles per hour on the east-bound main track, resulting in injuries, for which he seeks damages.

If the matter of crossing gates was not involved in this case, there could be no question as to appellant's negligence as a matter of law. Davis v. Chicago, R. I. & P. Ry. Co. (C. C. A.) 159 F. 10, 16 L. R. A. (N. S.) 424; St. Louis & S. F. R. Co. v. Cundieff (C. C. A.) 171 F. 319; Chicago, M. & St. P. Ry. Co. v. Bennett (C. C. A.) 181 F. 799; Bradley v. Missouri Pac. R. Co. (C. C. A.) 288 F. 484; Noble v. Chicago, M. & St. P. Ry. Co. (C. C. A.) 298 F. 381; Parramore et al. v. Denver & R. G. W. R. Co. (C. C. A.) 5 F.(2d) 912; Bergman v. Northern Pac. Ry. Co. (C. C. A.) 14 F.(2d) 580; Kutchma v. Atchison, T. & S. F. Ry. Co. (C. C. A.) 23 F.(2d) 183.

The case of Baltimore & O. R. R. Co. v. Goodman, Adm'x, etc., 275 U. S. 66, 70, 48 S. Ct. 24, 25, 72 L. Ed. 167, 56 A. L. R. 645, goes further than any other case on the subject of liability for accidents at railway crossings. There the court held that, if the circumstances are such that the driver of an automobile approaching a crossing cannot be sure "whether a train is dangerously near he must stop and get out of his vehicle, * * * that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk," and also it points out that generally the question of due care is for the jury, but that they are dealing with a standard of conduct, and "when the stand-

ard is clear it should be laid down once for all by the Courts." Counsel for appellant with commendable frankness admits that, if appellant as a matter of law owed the duty to look west under the circumstances he had to come to a full stop to do so, and that he would owe such duty in the absence of crossing gates. Therefore the case narrows to the question of whether or not the situation as to the raised crossing gates made the alleged negligence of appellant a matter for the jury to determine. It must be borne in mind that this is not a case where gates were raised as a party approached a railroad crossing. Instances arise every day in cities where automobiles and pedestrians are held at a crossing by the gates being down, and, after a train passes, the gates are raised and parties awaiting proceed, upon the invitation therein implied, to cross the track. That situation is quite different from the one here presented. Appellant had lived near this crossing for many years, and must have known as a matter of common sense that the gates might freeze up in the severe winters. There was no one apparently in charge of them as he approached, and he had not seen them raised and had no reason to infer that they had been raised immediately prior to his coming up to the track.

We refer first to a few of the cases outside of this circuit where the question of crossing gates was involved.

In Erie Railway Co. v. Schultz (C. C. A.) 183 F. 673, where the party waited before a closed gate until the train had gone by and the gate had lifted, the court held the question of his contributory negligence was for the jury, and pointed out that a party must use his senses of sight and hearing according to the standard of a reasonably prudent man under similar circumstances, stating that open gates generally make the question of contributory negligence for the jury, and said (page 676 of 183 F.): "In spite of the fact that, as we think, the traveler, crossing under circumstances like those shown by this record, is not bound absolutely and at all events to look both ways on the very instant when he comes clear of the obstructions, still his failure to use his eyes and ears might, under some circumstances, be so clearly not the conduct of a prudent man that a verdict would be directed against him, but in the present case this question was rightfully left to the jury."

In Pennsylvania Co. v. White (C. C. A.) 242 F. 437, the situation was one where White approached the track while the gates were up, and saw the operator in his shanty

near the gates. After he got on the track they were closed on each side. Under those circumstances the question of contributory negligence was held to be for the jury.

In Delaware, L. & W. R. Co. v. Welshman (C. C. A.) 229 F. 82, 85, L. R. A. 1916E, 816, the court said: "Of course, the raising of the gates did not make the railroad either an insurer or the sole guardian of the crosser's safety. The duty of care, of the use by the crosser of sight, hearing, and such other factors of safety as the situation and circumstances permitted and required of one intent on his own safety, still rested on him. The raised gate is not an invitation to cross without care, but an invitation to cross with the use of all care the situation permits. To hold otherwise would be to make gates and flagmen harmful creators of negligence instead of helpful aids to safety."

Erie R. Co. v. Weber (C. C. A.) 207 F. 293, was a case where the gates were raised as parties approached a crossing. There were some impediments to sight, such as smoke and steam. The court held contributory negligence was for the jury.

Other cases holding that, where crossing gates are up, there is such an invitation to cross that, in event of a collision between a train and a traveler, the question of due care is generally for the jury, are Hines v. Smith (C. C. A.) 270 F. 132; Vascacillas v. Southern Pacific Co. (C. C. A.) 247 F. 8; Delaware & H. Co. v. Larnard (C. C. A.) 161 F. 520. See, also, Flannelly v. Delaware & Hudson Co., 225 U. S. 597, 32 S. Ct. 783, 56 L. Ed. 1221, 44 L. R. A. (N. S.) 154.

In Blount v. Grand Trunk Ry. Co. (C. C. A.) 61 F. 375, 378, the court by Judge Taft said: "The right to rely on the action of the railway company's employee in lowering the gate is not absolute. State v. Boston & M. R. Co., 80 Me. 430–444, 15 A. 36. If it were, then a man would be justified in walking up to and over a railway crossing with closed eyes and stopped ears whenever the gate is not down to obstruct his passage. The weight to be given to such an implied invitation depends on circumstances."

This court has considered in a number of cases the effect upon contributory negligence of open gates; the leading one being Atchison, T. & S. F. Ry. Co. v. McNulty (C. C. A.) 285 F. 97, 100. The gates at the crossing involved were not operated after 4 p. m., and the accident occurred between 5 and 6 p. m. The driver of the car had no knowledge that the gates were not operating at the time in question. This court said: "There was also testimony from which it could have been found that neither the bells on the engine, nor the alarm bells which had been installed at this crossing, rang as the train approached, and these facts are relied upon as excusing the driver's inattention to the train. Neither open gates nor failure of the railway company to give signals at a railway crossing relieves one about to cross the tracks from the duty to use due care to look and listen for an approaching train." The court further said (page 101): "The act of looking towards the track at a point where the view was obstructed was not sufficient diligence for it is the settled rule that a traveler approaching a known railway crossing 'does not relieve himself of the imputation of negligence by looking where he cannot see, and omitting to look again where he could see, and avoid danger.' "

In Wabash Ry. Co. v. Huelsmann (C. C. A.) 290 F. 165, where crossing gates were maintained from 7 a. m. to 5 p. m., plaintiff was injured thereafter while the gates were open. It was held that, had plaintiff looked after he passed the shed, he must have seen the train, and that open gates did not relieve him from the duty to look and listen for such train.

Union Pacific R. Co. v. Rosewater (C. C. A.) 157 F. 168, 171, 15 L. R. A. (N. S.) 803, 13 Ann. Cas. 851 (this Circuit), bears on the question here, although not a crossing gate case. Dr. Rosewater drove upon the track at a crossing in Omaha upon signal of the flagman. The trial court instructed the jury that, if the flagman signaled him to cross he had the right to presume that it was safe for him to do so, "unless he knew the danger of doing so, and that the danger was so obvious and threatening that no man of ordinary care and prudence would have assumed the risk." This court held that the instruction was erroneous in that it relieved the plaintiff from any active duty for his own safety and permitted him to rely on the flagman unless danger of doing so obtruded itself on his notice. The judgment was reversed on account of this instruction.

Whatever may be the rule of other circuits, it is unquestionably the rule of this circuit that open gates at a railway crossing do not relieve one about to cross the tracks from the duty to exercise due care in looking and listening for an approaching train. What would constitute due care might be quite different in a situation where the gates were raised as the party approached the crossing, thus indicating that some one was in charge thereof with a knowledge of approaching trains, and where there is nothing

to show that the gates are in fact being operated or in condition to be operated.

Under the circumstances presented by this record, was the court justified in holding as a matter of law that appellant was guilty of contributory negligence?

From the evidence introduced in the case it fairly appears that the crossing flagman was, immediately before and up to the very time of the accident, waving a lantern on the crossing to signal parties to stop. The train was approaching at a speed of about 10 miles per hour. The crossing was illuminated by the headlight as the train approached. One of the witnesses testified that the crossing when the train was two or three hundred feet away was lighted by the headlight almost as bright as day. The street car flagman was ringing the bell on the shanty immediately south of the tracks. The bell on the engine was ringing. A number of people in automobiles had been stopped by the flagman's signal and were waiting for the train to pass. Some of the parties who had stopped for the crossing noticed the crossing flagman on the crossing waving a lighted lantern when they were a block away from it. Appellant knew all the obstructions to view at this crossing, knew it was a double track at this point, and knew that there was only a short distance after he had passed the obstructions where he could see a train approaching from the west until he came upon the tracks. He testified that he came along at about 18 miles an hour; that he could not see a train coming from the west at the place where he looked to his right because of the house and billboards; that he slowed down to 10 or 12 miles an hour, looked to the left to see if a train was coming from that direction, and knew nothing more until he was struck by the train. The evidence conclusively shows that he continued from where the crossing gate was up to the place of the collision at a speed of 12 miles an hour. He knew that at the point he claims to have looked to the right the house obstructed his view. The curtains were on his car, and, while he testifies no bell was rung and no switchman was on the crossing within his range of view, the evidence is overwhelmingly the other way. His own witnesses prove the contrary. There is no question under the evidence that the flagman was on the crossing waving a lantern to stop the automobilists from crossing, and all the drivers stopped and waited for the train to pass except appellant. He approached the crossing at a greater speed than the train was making, cutting around the other automobiles waiting

to cross, and nearly running over the flagman in his endeavor to beat the train over the crossing. Mrs. Princeton, one of the witnesses, testified as follows:

"A. * * * All I know is that Mr. Lang's car cut around the others and it was evident that he was trying to get across ahead of the train. Then I saw the flagman jump over.

* * * * * *

"Q. And where was the crossing flagman then? A. He was running back and forth just frantically when he saw this car coming toward him, swinging the lantern for all he was worth. All he was looking for was to save the automobile man's life, not his own."

There certainly could be no invitation by raised gates to pass onto a railroad crossing where a flagman on the crossing was waving a lighted lantern to stop, which must have been seen by a party attempting to cross.

It seems clear from this record that appellant, by the exercise of the slightest diligence, must have known that a train was approaching.

In Hickey v. Mo. Pac. R. R. Corp., 8 F.(2d) 128, 131, this court said: "If he had notice by any means of the approach of the train, he could not recover for the negligence of the defendant in failing to give the customary signals." If he had been approaching the tracks at a reasonable rate of speed he could have stopped the automobile within a few feet and avoided injury. This court said in Northern Pac. Ry. Co. v. Tripp, 220 F. 286, 288: "If the speed at which he was driving was such that he had not enough time to look in both directions along the railway track, reasonable care required that he should control that speed until his safety could be assured." In the mad rush to get somewhere, appellant, giving no heed to the dangers of the situation, cut around the other cars waiting to cross the tracks, and heedlessly and recklessly attempted to beat the train over the crossing. There can be no other conclusion therein from this evidence. If parties desire to indulge in the pursuit of attempting to beat railroad trains over crossings, they ought not to complain if their enterprise is unsuccessful.

The question of raised crossing gates under the circumstances of this case is not of the same importance as in some of the cases, because there was a flagman to give the signal to stop, which otherwise would have been imparted by the crossing gates. A party who nearly runs over a flagman who is trying to stop him from crossing a railroad track and pays no heed whatever to his signal should

not be heard to assert that he did so because he relied on an implied invitation to cross the track by virtue of raised gates.

The judgment of the trial court was correct, and is affirmed.